**In re Dennis Darol LINEHAN.**

Nos. C1–95–2022, C3–96–511.

Supreme Court of Minnesota.

May 27, 1999.

Eric S. Janus, St. Paul, Lisbeth J. Nudell, Minneapolis, Michael F. Cromett, Roseville, for appellant.

Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant County Attorney, St. Paul, Michael A. Hatch, Minnesota Attorney General, John L. Kirwin, Assistant Attorney General, St. Paul, for respondent.

Daniel W. Homstad, amicus curiae for Minnesota Civil Liberties Union, Minneapolis, MN.

Amicus curiae Thersa Nelson, Minnesota Civil Liberties Union Counsel, Minneapolis, MN.

## OPINION

BLATZ, C.J.

In this remand from the United States Supreme Court, appellant Dennis Darol

Linehan contends that the Minnesota Sexually Dangerous Person Act (SDP Act), Minn.Stat. § 253B.02, subd. 18c (1998), is unconstitutional on substantive and procedural due process grounds. He also argues that the SDP Act violates the ban on double jeopardy and ex post facto laws. We again address appellant's constitutional challenges to the SDP Act.

In order to adequately address appellant's contentions, we must first detail his extensive history of harmful sexual conduct. Appellant was sexually and physically abused as a child, and started his long course of harmful sexual conduct in his teens. In 1956, at age 15, appellant pulled down the shorts of a 4–year–old girl and was sent to reform school. In 1960, at age 19, he had intercourse with a 13–year–old girl. In 1963, appellant engaged in windowpeeping. Later that year, he and a friend beat and repeatedly raped L.H.

On June 10, 1965, after windowpeeping, the 23–year–old appellant killed 14–year–old B.I. while attempting to sexually assault her. In a one month window before his arrest, appellant committed two additional sexual assaults, including one rape. He pleaded guilty to kidnapping B.I. and was sentenced to a maximum prison term of 40 years. While serving his sentence, on June 20, 1975, appellant escaped from Stillwater Correctional Facility's minimum security unit and assaulted 12–year–old T.L. in a ditch off the side of a Michigan road. He was convicted of assault with intent to commit criminal sexual misconduct and was imprisoned in Michigan. He was returned to Stillwater prison five years later.

Shortly before the end of appellant's Minnesota prison term in 1992, the state moved to civilly commit appellant under the Psychopathic Personality Commitment Act (PP Act). Minn.Stat. §§ 526.09–.10 (1992). In order to be committed under the PP Act, as that act was interpreted by this court, a person must evidence an "utter lack of power to control [his or her] sexual impulses." *State ex rel. Pearson v. Probate Court of Ramsey County,* 205 Minn. 545, 555, 287 N.W. 297, 302 (1939), *aff'd,* 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940). This standard will be referred to as the "utter inability test."

In appellant's initial commitment and 60–day review hearings, the district court heard extensive testimony about appellant's mental state from a number of psychologists and psychiatrists. While the experts offered conflicting testimony as to appellant's sexual impulsivity, none were asked whether appellant met the *Pearson* utter inability test and none testified that appellant evidenced an utter lack of control over his sexual impulses. Nonetheless, the district court found that appellant met the *Pearson* criteria and ordered him civilly committed under the PP Act for an indefinite period of time.

The court of appeals upheld the district court's determination, *In re Linehan,* 503 N.W.2d 142 (Minn.App.1993), but we reversed, holding that appellant could not be committed under the PP Act because the state failed to present "clear and convincing evidence that appellant has an utter lack of power to control his sexual impulses." *In re Linehan,* 518 N.W.2d 609, 614 (Minn.1994) (hereinafter *Linehan I* ). Upon his release, appellant was paroled to a special residence on the grounds of Stillwater Correctional Facility. At Stillwater, he remained under "intensive supervised release" at a residence with substantial security precautions. Appellant participated in an out-patient sex offender program and was subject to drug testing.

In the wake of appellant's release, the legislature passed the SDP Act. Act of August 31, 1994, ch. 1, art. 1, 1995 Minn. Laws 5, 7–8 (codified as amended at Minn. Stat. § 253B.02, subd. 18c (1998)). The SDP Act establishes a new procedure for

civil commitment of persons who suffer from certain disorders and dysfunctions and are dangerous to the public. It states:

(a) A "sexually dangerous person" means a person who:

(1) has engaged in a course of harmful sexual conduct as defined in subdivision 7a;[1]

(2) has manifested a sexual, personality, or other mental disorder or dysfunction; and

(3) as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 7a.

(b) For the purposes of this provision, it is not necessary to prove that the person has an inability to control the person's sexual impulses.

Minn.Stat. § 253B.02, subd. 18c.

Upon enactment of the SDP Act, the state once again moved to have appellant civilly committed, this time as a sexually dangerous person. After hearing and rejecting constitutional challenges to the SDP Act, the district court held extensive initial commitment and 60–day review hearings. It found the requisite past course of harmful sexual conduct based on appellant's eight prior convictions. *In re Linehan*, No. P8–94–0382, slip op. at 5–9 (Ramsey County Dist. Ct., July 27, 1995) (hereinafter Initial Commitment Hearing). The district court also found that appellant suffered from an Axis II antisocial personality disorder, based in part on the appellant's own expert's testimony. *Id.* at 9–13. Finally, the court considered appellant's current aggressive behavior and his "lack of control in connection with sexual impulses" to be highly persuasive predictors of his future behavior. *Id.* at 23–24, 26. The court therefore found it highly probable that appellant would engage in future acts

of harmful sexual conduct and ordered appellant civilly committed under the SDP Act. *Id.* at 26. The court of appeals affirmed the district court's rulings. *In re Linehan*, 544 N.W.2d 308 (Minn.App.1996).

On appeal, we upheld the district court's findings following appellant's 60–day review hearing and ordered appellant indeterminately committed as a sexually dangerous person. *In re Linehan*, 557 N.W.2d 167 (Minn.1996) (hereinafter *Linehan II* ). In a separate opinion, we upheld appellant's initial civil commitment pursuant to the SDP Act against substantive due process, equal protection, ex post facto, and double jeopardy challenges under the federal and state constitutions. *In re Linehan*, 557 N.W.2d 171 (Minn.1996) (hereinafter *Linehan III* ). We concluded that an utter inability to control one's sexual impulses was not integral to narrowly tailoring the SDP Act to meet substantive due process requirements, and that distinguishing between sexually dangerous persons with and without mental disorders did not offend equal protection. *Id.* at 182–87. Further, the SDP Act was adjudged a civil and not a criminal law, and therefore held not to implicate the double jeopardy or ex post facto doctrines. *Id.* at 187–89. Appellant petitioned for a writ of certiorari for both cases from the United States Supreme Court.

Shortly before granting appellant's writ of certiorari, the Supreme Court decided *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), a challenge to a Kansas statute providing for civil commitment of sexually violent predators. Hendricks challenged his civil commitment under the Kansas Sexually Violent Predator Act (Kansas Act) on substantive due process grounds, and claimed that the Act established criminal proceedings in violation of the ban on double jeopardy and ex post facto laws.

---

**1.** Harmful sexual conduct is defined as "sexual conduct that creates a substantial likelihood of serious physical or emotional harm to

another." Minn.Stat. § 253B.02, subd. 7a(a) (1998).

The language of the Kansas Act is very similar to the language of the Minnesota SDP Act. The Kansas Act defines a sexually violent predator as one:

who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence.

Kan. Stat. Ann. § 59–29a02(a) (1994 & Supp.1998).

In a five to four decision, the Supreme Court held that the Kansas Act was constitutional and did not violate substantive due process or the ban on double jeopardy and ex post facto laws. In reviewing the substantive due process claim, the Supreme Court noted that states have civilly confined certain persons since the late 18th century. *Hendricks*, 521 U.S. at 357, 117 S.Ct. 2072. However, the Court clarified that it had sustained civil commitment statutes when the statutes "have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.' These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." *Id.* at 358, 117 S.Ct. 2072 (citations omitted). Under this scheme, the Supreme Court upheld the Kansas statute against Hendricks' substantive due process challenge. *Id.* at 360, 117 S.Ct. 2072.

The Supreme Court also determined that Kansas' commitment proceeding was civil in nature, focusing on both the legislature's stated intent and the purposes of the legislation. *Id.* at 368–69, 117 S.Ct. 2072. Therefore, Hendricks' double jeopardy and ex post facto claims could not stand. *Id.* at 369–71, 117 S.Ct. 2072.

The Supreme Court granted certiorari, vacated the judgment in *Linehan III*, and remanded it for reconsideration in light of its decision in *Hendricks*. *Linehan v. Minnesota*, 522 U.S. 1011, 118 S.Ct. 596, 139 L.Ed.2d 486 (1997). We now address appellant's constitutional challenges to the SDP Act in light of the *Hendricks* decision.

### I.

On remand, we view our mandate very narrowly. We reconsider our decision in *Linehan III* only in light of issues raised in the Supreme Court's *Hendricks* ruling.[2] As *Hendricks* analyzes both double jeopardy and ex post facto claims, we briefly review appellant's renewed double jeopardy and ex post facto challenges to the SDP Act.

 The Supreme Court's reasoning supports our earlier ruling that the SDP Act does not contravene the Double Jeopardy and Ex Post Facto Clauses. The Minnesota and Kansas Acts share many elements important to the Supreme Court's determination that the Kansas Act was civil. Both states' acts are in the civil commitment chapters of their statutes; neither requires a prior criminal conviction; neither includes a scienter requirement for commitment; and under both acts a person committed is to be released once he or she is sufficiently rehabilitated and can control his or her sexual impulses. *Hendricks*, 521 U.S. at 361–69, 117 S.Ct. 2072.

Further, the Supreme Court focused heavily on whether the Kansas Act implicated the two primary objectives of criminal punishment—retribution and deterrence—in its analysis of Hendricks' double jeopardy and ex post facto claims. *Hendricks*, 521 U.S. at 361–63, 117 S.Ct. 2072. The Minnesota SDP Act is similar to the Kansas Act, using prior criminal acts for evidentiary purposes only, and therefore

---

**2.** The Supreme Court did not discuss procedural due process in *Hendricks*. Accordingly we do not address appellant's procedural due process argument.

does not involve retribution. In addition, neither act implicates deterrence because persons committed under both acts are "by definition, suffering from a 'mental abnormality' or a 'personality disorder' that prevents them from exercising adequate control over their behavior." *Id.* at 362, 117 S.Ct. 2072; *infra* Section II. As our reasoning in *Linehan III* is supported by the Supreme Court's reasoning in *Hendricks,* we see no need to modify our earlier rulings on appellant's double jeopardy and ex post facto claims.

## II.

The essence of appellant's claim on remand is his substantive due process argument. "Although freedom from physical restraint 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action,' that liberty interest is not absolute." *Hendricks,* 521 U.S. at 356, 117 S.Ct. 2072 (quoting *Foucha v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992)). Rather, substantive due process protects individuals from "certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (quoting *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)); *see also State v. Guminga,* 395 N.W.2d 344, 346–47 (Minn.1986). When faced with a civil commitment law, "the judiciary has a constitutional duty to intervene before civil commitment becomes the norm and criminal prosecution the exception." *Linehan III,* 557 N.W.2d at 181. Still, the state long has had the power to civilly commit certain persons in narrow circumstances. *Hendricks,* 521 U.S. at 357, 117 S.Ct. 2072.

In determining whether a civil commitment law violates substantive due process, a court will subject the law to strict scrutiny, placing the burden on the state to show that the law is narrowly tailored to serve a compelling state interest. *Linehan III,* 557 N.W.2d at 181. States have a compelling interest in both protecting the public from sexual violence and rehabilitating the mentally ill. *Addington v. Texas,* 441 U.S. 418, 426, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *Linehan III,* 557 N.W.2d at 181; *In re Blodgett,* 510 N.W.2d 910, 916 (Minn.1994). As the state has set forth compelling interests supporting the SDP Act, this case turns on whether the state has demonstrated that the SDP Act is narrowly tailored to meet these interests.

Appellant argues that the SDP Act does not sufficiently narrow the class of targeted persons because it dispenses with the need to prove that a person has an utter inability to control his or her sexual impulses before allowing indeterminate civil commitment. He maintains that the utter inability test set out in *Pearson 's* interpretation of the PP Act sets the outer constitutional limit for civil commitment, and that this outer limit was upheld in *Hendricks.* Appellant's arguments raise two questions: (1) does *Hendricks* require a complete or, at a minimum, a partial lack of volitional control over sexual impulses in order to narrowly tailor a civil commitment law to meet substantive due process standards; and (2) does the SDP Act meet the substantive due process standards set out in *Hendricks?*

First we consider *Hendricks '* substantive due process reasoning. In *Hendricks,* the Supreme Court affirmed the forcible civil detainment in certain narrow circumstances of "people who are unable to control their behavior and who thereby pose a danger to the public health and safety." *Hendricks,* 521 U.S. at 357, 117 S.Ct. 2072. It reasoned that a finding of mere dangerousness was not sufficient to justify civil commitment, but that dangerousness cou-

pled with proof of an additional statutory factor such as a mental illness or personality disorder could ground civil commitment as such additional "requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." *Id.* at 358, 117 S.Ct. 2072.

The Supreme Court turned to the Kansas Act and concluded that it

> requires a finding of future dangerousness, and then links that finding to the existence of a "mental abnormality" or "personality disorder" that makes it *difficult, if not impossible, for the person to control his dangerous behavior.* * * * [the Kansas Act thereby] narrows the class of persons eligible for confinement to those who are *unable to control their dangerousness.*

*Id.* (emphasis added) (citations omitted).

Applying the Kansas Act to Hendricks' circumstances, the Court held Hendricks' "lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." *Hendricks,* 521 U.S. at 360, 117 S.Ct. 2072. At no point in its analysis did the Supreme Court state that a civil commitment statute aimed at sexually dangerous persons could pass substantive due process without a volitional impairment element. Rather, the Court's reasoning establishes that some lack of volitional control is necessary to narrow the scope of civil commitment statutes.[3]

3. The dissent contends that we read language into *Hendricks* to soften the volitional control requirement. However, it is the dissent that unreasonably narrows the *Hendricks* holding by inserting the word "totally" in front of the word "control" whenever it refers to the Supreme Court's analysis of a person's ability to control his or her sexual impulses. In doing so, the dissent overstates the *Hendricks* holding. *Hendricks* states that a person may be

Even the dissent in *Hendricks* subscribed to the notion that some lack of volitional control is necessary for civil commitment statutes to stay within substantive due process bounds. The dissent noted that Hendricks was committed under the Kansas Act not just on the basis of his antisocial behavior, but also because of Hendricks' "highly unusual inability to control his actions." *Hendricks,* 521 U.S. at 375, 117 S.Ct. 2072 (Breyer, J., dissenting). Thus, the conclusion that some degree of volitional impairment must be evidenced to satisfy substantive due process garnered nearly unanimous Supreme Court support.

■ As *Hendricks* limits involuntary civil confinement to "those who suffer from a volitional impairment rendering them dangerous beyond their control," *Hendricks,* 521 U.S. at 358, 117 S.Ct. 2072, we must consider whether the Minnesota SDP Act also requires a similar volitional impairment. We begin by comparing the Minnesota and Kansas Acts. For the most part, the Minnesota SDP Act mirrors the Kansas Act. Both contain three-prong tests that must be met to civilly commit someone as a sexually dangerous person. The Kansas Act defines a sexually violent predator as one:

■ who has been convicted of or charged with a sexually violent offense and

■ who suffers from a mental abnormality or personality disorder which makes the person

■ likely to engage in the predatory acts of sexual violence.

Kan. Stat. Ann. § 59–29a02(a).

The Minnesota SDP Act defines a sexually dangerous person as one who:

> civilly committed if he suffers from a mental abnormality or personality disorder "that makes it difficult, if not impossible, for the person to control his dangerous behavior." *Hendricks,* 521 U.S. at 358, 117 S.Ct. 2072. Clearly this language does not require an utter lack of control over harmful behavior, but rather a lack of adequate control over harmful behavior.

(1) has engaged in a course of harmful sexual conduct * * *;

(2) has manifested a sexual, personality, or other mental disorder or dysfunction; and

(3) as a result, is likely to engage in acts of harmful sexual conduct * * *.

Minn.Stat. § 253B.02, subd. 18c(a).

Under the Supreme Court's reading of the Kansas Act, the statute "requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated." *Hendricks*, 521 U.S. at 357–58, 117 S.Ct. 2072. Each of the prongs is critical because together they "limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." *Id.* at 358, 117 S.Ct. 2072. Like the Kansas Act, the Minnesota SDP Act requires evidence of past harmful sexual behavior and a present qualifying disorder or dysfunction that makes future dangerous conduct highly likely if the person is not incapacitated. Minn.Stat. § 253B.02, subd. 18c(a); *Linehan III*, 557 N.W.2d at 180. However, unlike the Kansas Act, the Minnesota Act explicitly states that "it is not necessary to prove that the person has an inability to control the person's sexual impulses." Minn.Stat. § 253B.02, subd. 18c(b). This section calls into question whether the Minnesota Act is outside the embrace of *Hendricks'* reasoning.

■ Our interpretation of section 253B.02, subd. 18c, must be guided by well-settled canons of statutory construction. The legislature has stated that "[e]very law shall be construed, if possible, to give effect to all its provisions." Minn. Stat. § 645.16 (1998); *see United Power Ass'n v. C.I.R.*, 483 N.W.2d 74, 79 (Minn. 1992). Similarly, this court has stated that "a statute is to be construed as a whole so as to harmonize and give effect to all of its parts." *Willmus ex rel. Willmus v. Comm'r of Revenue*, 371 N.W.2d 210, 213 (Minn.1985) (relying on *Anderson v. Comm'r of Taxation*, 253 Minn. 528, 533, 93 N.W.2d 523, 528 (1958)). Finally, when interpreting a statute, we are guided by the principle that "when any doubts arise as to the constitutionality [of a law] such doubts must be resolved in favor of the law." *Pearson*, 205 Minn. at 555, 287 N.W. at 302.

In interpreting section 253B.02, subd. 18c, we first consider the SDP Act's predecessor, the PP Act, under which the state first attempted to commit appellant. The PP Act required

the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any such conditions, as to render such person irresponsible for personal conduct with respect to sexual matters and thereby dangerous to other persons.

Minn.Stat. § 526.09 (1992).

In *Pearson* we held that the PP Act mandated that the state prove a person: (a) has engaged in "a habitual course of misconduct in sexual matters," and (b) has "evidenced an utter lack of power to control [his or her] sexual impulses," such that (c) the person is "likely to attack or otherwise inflict injury, loss, pain or other evil on the objects of their uncontrolled and uncontrollable desire." 205 Minn. at 555, 287 N.W. at 302. The state first tried to commit appellant under the PP Act but we reversed the commitment in *Linehan I*, holding that the district court did not have sufficient evidence before it to find that appellant was utterly unable to control his sexual impulses. *Linehan I*, 518 N.W.2d at 610.

After our decision in *Linehan I*, the legislature convened in a special session to

amend the PP Act. As passed, the amended PP Act was reworked into what is now known as the Sexual Psychopathic Personality Act (SPP Act). Act of August 31, 1994, ch. 1, art. 1, 1995 Minn. Laws 5, 6 (codified as amended at Minn.Stat. § 253B.02, subd. 18b (1998)). In order to civilly commit a person under the SPP Act, the state must show:

> the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any of these conditions, which render the person irresponsible for personal conduct with respect to sexual matters, if the person has evidenced, by a habitual course of misconduct in sexual matters, *an utter lack of power to control the person's sexual impulses* and, as a result, is dangerous to other persons.

Minn.Stat. § 253B.02, subd. 18b (1998) (emphasis added).

In conjunction with the SPP Act, the legislature passed the law at issue in this case, the SDP Act. Act of August 31, 1994, ch. 1, art. 1, 1995 Minn. Laws 1, 5–9 (codified at Minn.Stat. § 253B.02, subd. 18c (1998)). In the SDP Act, the legislature set out a three prong test for determining whether a person is sexually dangerous for purposes of civil commitment. Minn.Stat. § 253B.02, subd. 18c(a). Nowhere in the SDP Act did the legislature set forth the "utter inability test." However, the legislature stated that "it is not necessary to prove that the person has an inability to control [his or her] sexual impulses." *Id.* subd. 18c(b).

Against this legislative history, we held in *Linehan III* that the newly enacted SDP Act did not require "proof that the proposed patient has an inability to control his or her sexual impulses" in order to uphold civil commitment. *Linehan III,*

557 N.W.2d at 179 (interpreting the SDP Act). We then reviewed adequate grounds for civil commitment of mentally disordered and dangerous persons, and concluded that the SDP Act was enacted to protect the public from sexual predators with mental disorders "who retain *enough control* to 'plan, wait, and delay the indulgence of their maladies until presented with a higher probability of success.'" *Linehan III,* 557 N.W.2d at 182 (quoting *Linehan,* 544 N.W.2d at 318) (emphasis added). *Linehan III* acknowledged that the SDP Act allows for commitment of individuals who do not lack total control over their harmful sexual impulses but have a degree of volitional impairment such that they are "unable to control their dangerousness," as *Hendricks* requires. 557 N.W.2d at 182; *Hendricks,* 521 U.S. at 358, 117 S.Ct. 2072. This becomes even clearer when viewed against the legislature shifting from the requirement that an utter lack of control be proven while remaining cognizant of the bounds of substantive due process.

■ Accordingly, the provision in subdivision 18c(b), stating that "it is not necessary to prove that the person has an inability to control the person's sexual impulses," should be read very narrowly, as in the *Linehan III* decision, to mean only that the state does not need to prove that a person meets the *Pearson* utter inability standard, thus differentiating the SDP Act from the PP Act or its successor statute, the SPP Act. Still, like the Kansas Act, the Minnesota SDP Act "requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior." *Hendricks,* 521 U.S. at 358, 117 S.Ct. 2072; *see* Minn.Stat. § 253B.02, subd. 18c(a). Such a reading harmonizes all parts of the statute and acknowledges the legislature's

intent to abandon the "utter lack of control" test required for commitments under the SPP Act while insuring that the statute is narrowly tailored.[4] *Compare* Minn.Stat. § 253B.02, subd. 18b, *with* Minn.Stat. § 253B.02, subd. 18c; *see also Pearson,* 205 Minn. at 555, 287 N.W. at 302.

■ While *Pearson* interpreted the PP Act to include an utter inability to control standard, we subsequently recognized that other grounds for civil commitment exist. *See Blodgett,* 510 N.W.2d at 914 n. 6 (allowing for breadth in civil commitment classifications in challenge to commitment under PP Act). We now clarify that the SDP Act allows civil commitment of sexually dangerous persons who have engaged in a prior course of sexually harmful behavior and whose present disorder or dysfunction does not allow them to adequately control their sexual impulses, making it highly likely that they will engage in harmful sexual acts in the future.

### III.

■ In light of our interpretation of the SDP Act, we must determine whether appellant's commitment is supported by clear and convincing evidence. We review only whether appellant demonstrates a lack of adequate control over his sexually harmful behavior based on the district court's findings, as all of the other. elements of appellant's commitment were fully reviewed in *Linehan III,* 557 N.W.2d at 189–91.

The dissent states that there are no factual findings supporting a holding that

appellant lacks adequate control over his harmful sexual behavior, and that we have stepped into the role of fact finder. However, the district court records from both the initial commitment and 60–day review hearings are replete with findings concerning appellant's lack of volitional control over his sexually dangerous tendencies, which we merely summarize. The district court's findings support our conclusion that appellant lacks adequate control over his sexual behavior and merits commitment under the SDP Act.

First, the district court found that appellant had recently displayed impulsiveness in his sexual behavior. After hearing testimony from prison guards and viewing a videotape, the district court determined that appellant engaged in physical play with his step-daughter and then left the room to masturbate, once on December 31, 1994 and once on January 1, 1995.[5] Initial Commitment Hearing at 23; *In re Linehan,* No. P8–94–0362, slip op. at 7 (Ramsey County Dist. Ct., February 23, 1996) (hereinafter 60–Day Hearing). Both incidents occurred during time-limited visits. The court found that appellant's masturbation "shows a continuing sexual attraction to young females." Initial Commitment Hearing at 23. Further, the court stated that, because the incidents occurred during time-limited visits, they "suggest a degree of impulsivity and lack of control in connection with sexual impulses." *Id.*

Appellant later lied to a psychiatrist about the December 31 and January 1 incidents, stating that he no longer masturbated. The district court found that

---

4. The dissent states that the SDP Act standing alone and as construed by the court is unconstitutional because it allows people to be civilly committed upon only a showing of future dangerousness. However, the dissent misconstrues both the SDP Act and our reasoning. In order to justify civil commitment, the SDP Act requires the state to prove that a person: (1) has engaged in a course of harmful sexual conduct; (2) suffers from a current disorder or dysfunction; and (3) this current

disorder or dysfunction does not allow the person to adequately control his or her behavior such that the person is highly likely to commit harmful sexual acts in the future.

5. The district court's orders both incorporated their memoranda by reference. While the orders were sparse, the memoranda carefully detailed the court's reasoning.

appellant knowingly "lied about a sexual matter when he thought he could not be caught doing so." [6] *Id.* The incidents, appellant's masturbation after playing with a young girl and his later denial that he masturbated, cumulatively show not only that appellant lacks adequate control over his sexual impulses, but also that appellant conceals his sexual misconduct.

In considering appellant's likelihood of engaging in harmful sexual conduct, the district court was also concerned about appellant's history of alcohol abuse. Appellant admits that most of his sexual assaults occurred while he was under the sway of alcohol—he could not remember many of his offenses because he was drunk at the time of the assaults. While incarcerated, appellant completed the Atlantis Chemical Dependency Program. However, appellant currently refuses to participate in Alcoholics Anonymous (AA), claiming that he does not accept AA's philosophy. In discussing its initial findings, the district court found a sex offender therapist's testimony that "chemically dependent offenders who do not accept the AA philosophy are more likely to reoffend than those who do accept it" to be persuasive.[7] 60–Day Hearing at 6. Appellant's refusal to participate in offered substance abuse treatment gave the district court great concern that appellant will reoffend. Initial Commitment Hearing at 21; 60–Day Hearing at 6.

The district court also considered appellant's behavior toward hospital and prison staff in determining appellant's likelihood of engaging in harmful sexual conduct. It found that appellant displayed aggressive-ness toward the St. Peter Security Hospital staff when confined there.[8] Initial Commitment Hearing at 24; 60–Day Hearing at 6. While living in a residence on the grounds of Stillwater Correctional Facility after his parole, appellant at times acted abusively toward his guards. Initial Commitment Hearing at 24. The district court found that appellant's aggression in these circumstances showed appellant's lack of control over his behavior, noting that in light of appellant's long incarceration "one has to look for more subtle signs than rape and killing." *Id.* Appellant's continued aggressive behavior in situations where he surely knew his behavior was subject to careful review further demonstrated appellant's inability to exercise adequate control over his actions.

Finally, the district court made specific findings that appellant met the diagnostic criteria for antisocial personality disorder, basing its findings on the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) (DSM–IV). 60–Day Hearing at 10–11. Criteria for antisocial personality disorder include a failure to conform to social norms with respect to lawful behavior, deceitfulness, irritability and aggressiveness, reckless disregard for the safety of self and others, and lack of remorse. DSM–IV at 649–50. The court found that appellant met each of these criteria. 60 Day Hearing at 10–11. However, the trial court made no findings on another criterion for antisocial personality disorder, impulsivity or failure to plan ahead. *Id.* at 10. We do not believe that this omission is conclusive as to the amount of control appellant has over his sexual behavior. Im-

---

**6.** The district court also relied on appellant's willingness to lie about sexual matters when determining that he suffers from antisocial personality disorder. One of the diagnostic criteria for antisocial personality disorder is deceitfulness, as indicated by repeated lying. Initial Commitment Hearing at 10.

**7.** The court also noted that appellant refused to participate in sex offender treatment dur-ing his initial commitment. 60–Day Hearing at 3.

**8.** The district court also relied on appellant's aggressive behavior in determining that appellant suffers from antisocial personality disorder. Initial Commitment Hearing at 11.

pulsivity as defined in DSM–IV refers to ability to plan ahead, such as "sudden changes of jobs, residences, or relationships," but does not encompass ability to control one's sexual behavior. DSM–IV at 646. Therefore, the lack of court findings on this diagnostic criterion does not indicate that appellant is able to exercise adequate control over his harmful sexual urges.

The district court record contains substantial evidence that appellant continued to engage in impulsive sexual behavior and lacks adequate control over his harmful sexual impulses. The district court found that appellant clearly meets all of the prongs of the SDP Act: he has a long history of engaging in harmful sexual behavior, he suffers from Axis II antisocial personality disorder, and he is highly likely to engage in acts of harmful sexual conduct in the future. Accordingly, we uphold his commitment under the SDP Act.

We therefore reaffirm our decision in *Linehan III*, 557 N.W.2d 171. We also affirm the court of appeals decision in *In re Linehan*, 544 N.W.2d 308, holding that the SDP Act is constitutional and appellant's civil commitment under the SDP Act is appropriate.

Affirmed.

PAGE, Justice (dissenting).

**An avidity to punish is always dangerous to liberty. It leads men to stretch, to misinterpret, and to misapply even the best of laws. He that would make his own liberty secure must guard even his enemy from oppression; for if he violates his duty he establishes a precedent that will reach to himself.**

Thomas Paine, *Dissertation on First Principles of Government, in The Complete Writings of Thomas Paine* 588 (Philip S. Foner ed., The Citadel Press 1945) (1795).

The fundamental issue before the court is whether the Sexually Dangerous Person Act (SDP Act), Minn.Stat. § 253B.02, subd. 18c (1998), violates substantive due process by allowing the state to use civil commitment to indefinitely confine sexual predators who do not have a volitional impairment rendering them dangerous beyond their control. As I read the court's opinion, the court concludes that the only constitutional limit on the state's ability to confine such individuals indefinitely is a showing of the individual's future dangerousness. The court is wrong. The Constitution requires more. In upholding the SDP Act, the court is acting as nothing more than an arm of the legislature in violation of our duty "to provide safeguards against the state's improper use of civil commitment as a constitutionally invalid form of preventive detention." *In re Linehan*, 557 N.W.2d 171, 192 (Minn.1996) (Tomljanovich, J., dissenting) (footnote omitted) (hereinafter *Linehan III* ).

In *In re Linehan*, 518 N.W.2d 609 (Minn.1994) (hereinafter *Linehan I* ), we vacated Linehan's commitment under the Psychopathic Personality Commitment Act (PP Act) because the state, while establishing Linehan's dangerousness, failed to establish by clear and convincing evidence, as required by our decision in *State ex rel. Pearson v. Probate Court of Ramsey County*, 205 Minn. 545, 555, 287 N.W. 297, 302 (1939), *aff'd*, 309 U.S. 270, 273, 60 S.Ct. 523, 84 L.Ed. 744 (1940), that Linehan exhibited an utter lack of power to control his sexual impulses. *See Linehan I*, 518 N.W.2d at 614. In effect, we concluded that the state failed to prove that Linehan had a volitional impairment rendering him dangerous beyond his control. On the heels of and in direct response to *Linehan I*, the Minnesota Legislature passed the SDP Act under which the state immediately sought and quickly obtained Linehan's

commitment.[1] The PP Act and the SDP Act are for all practical purposes the same except for one very important difference. The difference is that the PP Act requires an individual to have an "utter lack of ability to control" his or her sexual behavior before he or she may be committed whereas the SDP Act is explicit that the inability to control one's sexual behavior is not a factor to be considered. *Compare Pearson*, 205 Minn. at 554, 287 N.W. at 302, *with* Minn.Stat. § 253B.02, subd. 18c(b) (providing that "it is not necessary to prove that the person has an inability to control the person's sexual impulses"). In order to circumvent the PP Act's "utter lack of ability to control" requirement, which we deemed necessary to make the PP Act constitutional in *Pearson*, the legislature simply dispatched with that requirement. While the PP Act seeks to protect the public from sexually dangerous people who are unable to control their sexual behavior, the SDP Act is designed to permit the indefinite commitment of not only those individuals covered by the PP Act but all other sexually dangerous people. No sexually dangerous person is excluded from its reach.

In reviewing Linehan's commitment under the SDP Act, this court in *Linehan III* first concluded that there is no principled and constitutionally significant distinction between Linehan's commitment under the SDP Act and the commitments of other sexual predators upheld under the PP Act. *See Linehan III*, 557 N.W.2d at 179. The court went on to conclude, consistent with the SDP Act's express language, although somewhat inconsistent with the above conclusion and our holding in *Pearson*, that the "utter lack of ability to control" requirement of the PP Act was not necessary to narrowly tailor the SDP Act to meet substantive due process requirements. *See Linehan III*, 557 N.W.2d at 182. Linehan appealed that decision to the United States Supreme Court. The Court granted his writ of certiorari and then remanded for reconsideration in light of its recent decision in *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).

In *Hendricks*, a pedophile with an admitted inability to control his dangerous sexual behavior challenged his commitment under a Kansas law, which the court says is similar to the SDP Act,[2] on substantive due process grounds.[3] *See Hendricks*, 521 U.S. at 350, 117 S.Ct. 2072. In upholding the Kansas law, the Supreme Court noted that it had "sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'" *Id.* at 358, 117 S.Ct. 2072 (listing cases in which the Court upheld state civil commitment statutes). The Court further noted that the Kansas law was "consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerous-

1. The Minnesota Legislature convened a special session specifically to prevent Linehan's release. "The reason we're here, one of the reasons we're here obviously is because Mr. Linehan is on the streets." *Hearing Before the Joint Meeting of H. and S. Jud. Comm. and S. Crime Prev. Comm.*, 78th Minn. Leg., Spec. Sess., Aug. 24, 1994 (audio tape) (statement of Senator Ember Reichgott Junge, Chair of S. Jud. Comm.).

2. In fact, the Kansas law is more similar to our PP Act as interpreted by this court in *Pearson*. The SDP Act expressly provides that the individual's inability to control their sexu-

al behavior is not a factor to be considered in making the commitment determination while the PP Act and the Kansas law have no such provision. *Compare* Minn.Stat. § 253B.02, subd. 18c(b), *with* Minn.Stat. §§ 526.09–.10 (1992), *and* Kan. Stat. Ann. § 59–29a02(a) (1994 & Supp.1998).

3. Hendricks also challenged his commitment on ex post facto and double jeopardy grounds. *See Hendricks*, 521 U.S. at 350, 117 S.Ct. 2072.

ness." *Id.* In essence, the Court concluded that the individual's mental illness or mental abnormality has to render them unable to control their dangerousness before they may be civilly committed. In doing so, the Court treated "mental illness" and "mental abnormality" as synonymous with inability to control. At the same time, the Court implicitly reaffirmed its holding from *Foucha v. Louisiana*, 504 U.S. 71, 76, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), that "[an individual] is entitled to release when he has recovered his sanity or is no longer dangerous * * * [and] may be held as long as he is both mentally ill and dangerous, but no longer." *Hendricks*, 521 U.S. at 356–57, 117 S.Ct. 2072 (citing *Foucha*, 504 U.S. at 80, 112 S.Ct. 1780). Thus, as I read *Hendricks* and *Foucha*, before a sexual predator may be civilly committed the state must establish two things: (1) the individual's dangerousness, and (2) the in-

dividual's inability to control his or her dangerous sexual behavior.[4] Failure to establish either means that the state may not use civil commitment to confine the individual.

In a brazen effort to save the SDP Act at any cost, the court, in both *Linehan III* and today's decision, ignores the teachings of the Supreme Court. *Linehan III* fails for the reasons stated in the dissents to that decision. *See Linehan III*, 557 N.W.2d at 191–201 (Tomljanovich, J., dissenting); *id.* at 201–02 (Page, J., dissenting). Today's decision fails because the court continues to contend that the state need only establish a sexual predator's dangerousness in order to commit them under the SDP Act.[5] Although the court's opinion says that the SDP Act requires the state to establish that the individual has a "lack of adequate control" [6] over his sexual behavior in addition to dangerousness, in

**4.** It is not enough for the state to prove that an individual has a mental illness or mental abnormality and is dangerous; the state must show that the individual's mental illness or abnormality causes the individual to be "unable to control their dangerousness." *See Hendricks*, 521 U.S. at 358, 117 S.Ct. 2072.

**5.** The court states that the mental illness prong of the SDP Act limits the reach of indefinite preventive detention. However, the court fails to address the fact that the Supreme Court stated that the mental illness or mental abnormality must cause the individual's inability to control their harmful sexual conduct. *See Hendricks*, 521 U.S. at 358, 117 S.Ct. 2072 (stating that "[w]e have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor such as 'mental illness' or 'mental abnormality' "). Minnesota Statutes section 253B.02, subd. 18c(b) eliminates a finding of inability to control, leaving only mental illness and dangerousness. The court's interpretation of the SDP Act allows the state to lock up anyone whose mental abnormality makes them dangerous, whether or not they are dangerous beyond their control. Thus, the court impermissibly expands "the class of persons eligible for confinement" by allowing preventive detention of individuals with a mental illness or mental abnormality who are not dangerous beyond their control.

**6.** The court also uses the phrases "some lack of volitional control," "some degree of volitional impairment," "a degree of volitional impairment," and "a lack of adequate control." I will use the phrase "lack of adequate control" to refer to the court's inability to control requirement.

In creating the "lack of adequate control" standard, the court relies on the Supreme Court's fleeting statement in *Hendricks* that the Kansas Act "requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it *difficult, if not impossible,* for the person to control his dangerous behavior." *Hendricks*, 521 U.S. at 358, 117 S.Ct. 2072 (emphasis added). What the court cites but ignores, however, is the fact that the Supreme Court went on to explain this language by stating that the Kansas Act "is consistent with the requirements of [the other civil commitment] statutes that we have upheld in that it *narrows the class of persons eligible for confinement to those who are unable to control their dangerousness." Id.* (emphasis added). Indeed, throughout its opinion in *Hendricks*, the Supreme Court refers to those who are "unable to control," "who have a lack of volitional control," or who "suffer from a volitional impairment rendering them dangerous beyond their control." Thus, even though the Supreme Court used the phrase "difficult, if not impossible," it

reality this requirement is an illusion that amounts to nothing more than a euphemism for dangerousness.[7] Any and every individual who commits a sexual assault "lacks adequate control" over their sexual behavior. Moreover, in creating this standard, the court abandons its rationale for upholding the constitutionality of the SDP Act in *Linehan III* and willfully disregards the clear and unambiguous language of the SDP Act.

This new "lack of adequate control" standard is illusory in that the court provides no definition of what "lack of adequate control" means. As a result, the court's "lack of adequate control" standard provides no guidance as to which individuals with a mental illness or mental abnormality do not have enough control over their sexual behavior to make them dangerous beyond their control. The court provides no definition because "lack of adequate control" is not capable of definition.[8] Because this standard lacks definition, there is no limit on the state's ability to civilly commit all sex offenders,[9] and therefore, substantive due process protections are rendered meaningless.

More important, even if the "lack of adequate control" standard were capable of definition, it cannot meet constitutional muster because it completely eliminates

---

clearly meant that the state must make a showing that the individual being committed is "unable to control [his or her] dangerousness." This interpretation is also supported by the facts in *Hendricks*. During a jury trial, "Hendricks admitted that he had repeatedly abused children whenever he was not confined[,] * * * [that] he 'can't control the urge' to molest children[, and] that the only sure way he could keep from sexually abusing children in the future was 'to die.'" *Id.* at 355, 117 S.Ct. 2072. Thus, the Supreme Court analyzed the inability to control issue in the context of an individual with an utter lack of control over his sexual behavior. Our case presents a far more difficult set of facts that forces us to draw some outer limit on the state's ability to civilly commit sexual predators. Accordingly, the court's reliance on select portions of *Hendricks* to justify Linehan's commitment is inappropriate.

7. Reading the court's opinion is reminiscent of walking through a house of mirrors. As with walking through a maze of mirrors where every reflection in every direction, no matter how distorted, is a reflection of yourself, so too is reading today's opinion where no matter what words the court uses, dangerousness is reflected as the only limiting factor for commitment under the SDP Act.

8. It is interesting to note that in the criminal setting, we have rejected the doctrine of diminished capacity because it "inevitably opens the door to variable or sliding scales of criminal responsibility[, but] [t]he law recognizes no degree of sanity * * *. For the purposes of conviction there is no twilight zone between abnormality and insanity. An offender is wholly sane or wholly insane."

*State v. Bouwman,* 328 N.W.2d 703, 706 (Minn.1982) (internal citation omitted). Yet, while this court does not allow a defendant to use diminished capacity to avoid criminal responsibility, by its decision today it will allow the state to use diminished capacity's mirror opposite, "lack of adequate control," to civilly commit an individual. If there is "no twilight zone between abnormality and insanity" and an "offender is wholly sane or wholly insane," then what does "lack of adequate control" mean?

9. In fact, taking the court's interpretation of the SDP Act to its logical extreme would allow the state to indefinitely commit any class of individuals who have a record of past harmful conduct, suffer from a mental illness or mental abnormality, and who will likely engage in harmful conduct in the future. For example, we can predict that certain children who suffer from severe childhood onset-type Conduct Disorder, manifested by "forced sex, physical cruelty, use of a weapon, stealing while confronting a victim, and breaking and entering," will develop Antisocial Personality Disorder. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 87–89 (4th ed.1994). As adults, these children will engage in a "pervasive pattern" of behavior that features the "disregard for, and violation of, the rights of others." *Id.* at 645. Under today's decision, because these children have engaged in harmful and dangerous conduct in the past, have a mental abnormality, and can be predicted to engage in future dangerous conduct, there is nothing to prevent the state from enacting a statute permitting their preventive detention.

the boundary between civil commitment and criminal liability. With respect to those who engage in sexual misconduct, the objectives of civil commitment are to prospectively protect the health and safety of the community and to provide treatment for the committee. *See Hendricks,* 521 U.S. at 357, 117 S.Ct. 2072 ("Accordingly, States have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety."); *Linehan III,* 557 N.W.2d at 181 (stating that "the state has a compelling interest in protecting the public from sexual assault * * * [and] a compelling interest in the care and treatment of the mentally disordered"). *See also* Carol S. Steiker, *Forward: The Limits of the Preventive State,* 88 J.Crim. L. & Criminology 771, 785 (1998) (arguing that the state must "reserve indefinite civil commitment to those who are truly incapable of choosing to understand or to comply with the law"). The objectives of criminal liability are to punish offenders for their past wrongdoing and to deter those offenders and others from engaging in future misconduct. *See Foucha,* 504 U.S. at 80, 112 S.Ct. 1780 ("A State, pursuant to its police power, may of course imprison convicted criminals for the purposes of deterrence and retribution."); *see also* Steiker, *supra,* at 785. We allow preventive detention by way of civil commitment to confine individuals who cannot control their behavior in order to protect the public and to treat individuals for the malady causing their inability to control their behavior. If an individual regains the ability to control their behavior, then *Foucha* mandates the individual's release from detention, even if the individual continues to be dangerous. 504 U.S. at 76,

112 S.Ct. 1780 (stating that "[an individual] may be held as long as he is both mentally ill *and* dangerous, but no longer") (emphasis added). We do not allow preventive detention in the criminal setting because the state may not punish an individual for some potential future misconduct. *See id.* at 83, 112 S.Ct. 1780 (permitting the state to indefinitely confine all dangerous persons "would also be only a step away from substituting confinements for dangerousness for our present system, which, with only narrow exceptions * * *, incarcerates only those who are proved beyond a reasonable doubt to have violated a criminal law"). Thus, in order to preserve the distinction between civil commitment and criminal liability, something more than a finding of dangerousness is required. What is required is a finding that the individual suffers from a mental illness or mental abnormality that causes a volitional impairment rendering them dangerous beyond their control.[10] This requirement is consistent with the Supreme Court's statement that individuals such as Linehan, whose volitional impairment renders them only dangerous and not dangerous beyond their control are "more properly dealt with *exclusively* through criminal proceedings." *Hendricks,* 521 U.S. at 360, 117 S.Ct. 2072 (emphasis added). Therefore, Linehan, who the court concedes retains "enough control to 'plan, wait, and delay the indulgence of [his malady] until presented with a higher probability of success,'" *Linehan III,* 557 N.W.2d at 182 (quoting *In re Linehan,* 544 N.W.2d 308, 318 (Minn.App. 1996)), is more properly dealt with exclusively through criminal proceedings.

Substantive due process requires that Linehan's civil commitment be based on a finding of a volitional impairment rendering him dangerous beyond his control.

10. The court justifies Linehan's continued confinement in part by stating that the district court had "great concern that [Linehan] will reoffend." The court reasons that if Linehan is likely to reoffend, the state has met its burden. This reasoning illustrates how the court collapses the "lack of adequate control" requirement with the dangerousness requirement, making them indistinguishable from one another.

Absent such a finding, the Constitution, as explained in *Hendricks* and *Foucha*, precludes the state from civilly committing Linehan. Interestingly, at no place in its lengthy opinion does the court either say or suggest that Linehan suffers from a volitional impairment that renders him dangerous beyond his control. There is a simple reason for the omission: on the record before the court no such finding can be made.

Moreover, to withstand constitutional attack, the SDP Act must be narrowly tailored to meet the objectives of civil commitment. *See Linehan III*, 557 N.W.2d at 181 (citations omitted). Without a requirement that an individual be dangerous beyond their control, a civil commitment statute cannot be narrowly tailored because every individual who is dangerous, whether or not they are dangerous beyond their control, becomes subject to preventive detention. Yet, implicit in the court's discussion of the SDP Act is the unsupported assumption that every individual who suffers from a mental illness or mental abnormality that causes a volitional impairment rendering them dangerous is dangerous beyond their control. Thus, under the court's interpretation of the SDP Act, no one who is dangerous is "more properly dealt with exclusively through criminal proceedings," and therefore, the state may civilly commit any and every sexual offender. This result cannot stand.

Even if we assume, for purposes of argument, that the court's "lack of adequate control" standard is constitutional, the state still cannot continue to confine Linehan without a finding that he currently has a "lack of adequate control" over his sexual behavior. *See Foucha*, 504 U.S. at 78, 112 S.Ct. 1780 (stating that "keeping [a committed acquittee] against his will in a mental institution is improper absent a determination in civil commitment proceedings of *current* mental illness and dangerousness") (emphasis added). No such factual finding has ever been made, unless we accept the facts found by this court to be sufficient. However, the last time I checked, this court's role on appeal is not that of a fact finder. *See Stiff v. Associated Sewing Supply Co.*, 436 N.W.2d 777, 779 (Minn.1989) (holding that an appellate court "exceeds its proper scope of review" when it substitutes its own findings for those of the trial judge). Even if we accept the facts found by this court, there is nothing before the court which suggests that Linehan currently meets the court's undefined "lack of adequate control" standard because the court relies on a record that was created sometime before December of 1996.[11] At a minimum, Linehan is entitled to a hearing on whether he currently fits within this newly-created standard.

The court's transparent attempt to hold the SDP Act constitutional at all costs is made more obvious by the fact that the court, in violation of the most basic rules of statutory construction, ignores the plain language of the SDP Act. The court clearly misreads the SDP Act when, quoting *Hendricks*, it says that the Minnesota Act requires "a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dan-

11. The facts found by the court, which it contends justify Linehan's continued detention, do not in fact support that contention. What those facts support is the conclusion that whatever Linehan's volitional impairment may be, it does not render him dangerous beyond his control. If anything, the record establishes just how much control he has over his sexual behavior. For example, the court plainly contradicts itself when it cites the masturbation incidents to conclude both that Linehan "had recently displayed impulsiveness in his sexual impulses," and that Linehan "conceals his sexual misconduct." While these facts may be disturbing to the community and the court, they necessarily indicate that Linehan has the ability to control his behavior.

gerous behavior'" when in fact the SDP Act explicitly states that "it is not necessary to prove that the person has an inability to control [their] sexual impulses." *See Hendricks,* 521 U.S. at 358, 117 S.Ct. 2072; Minn.Stat. § 253B.02, subd. 18c(b). The SDP Act's language is free from ambiguity and cannot be read to include an inability to control requirement.

In *Linehan III,* we gave effect to the language of subdivision 18c(b) by concluding that inability to control was not required to civilly commit an individual. *See Linehan III,* 557 N.W.2d at 183. While I believe the court's constitutional analysis was flawed in *Linehan III,* at least its holding was consistent with the unambiguous language of the SDP Act. Now, in response to *Hendricks,* the court has done an about face and created the illusory "lack of adequate control" standard in an effort to force the SDP Act to fit within the strictures of *Hendricks.* The problem with this new standard, which the court pretends does not exist, is that the language of the SDP Act specifically and unequivocally states that an individual's inability to control their sexual behavior need not be proven. Yet, according to the court, the state must prove that the individual "lacks adequate control" — whatever that means.

In reviewing the constitutionality of a statute, "we must, when confronted with a statute which is susceptible of different interpretations, accept that one which is in conformity with the purpose of the act and in harmony with the provisions of the constitution." *Pearson,* 205 Minn. at 555, 287 N.W. at 302 (citations omitted). When the statute in question is free of ambiguity, we must give effect to the statutory language. *See Tuma v. Comm'r of Econ. Sec.,* 386 N.W.2d 702, 706 (Minn.1986); *see also* Minn.Stat. § 645.16 (1998). When doubts arise as to a statute's constitutionality, "[those] doubts must be resolved in favor of the law." *Pearson,* 205 Minn. at 555,

287 N.W. at 302 (citations omitted). In construing a statute, we may not substitute amendment for construction. *See State v. Moseng,* 254 Minn. 263, 269, 95 N.W.2d 6, 11–12 (1959). We may not read into the statute that which the legislature, for whatever reason, left out and conversely, we may not read out of the statute that which the legislature has explicitly included. We followed the above principles in upholding the PP Act in *Pearson.* There, the statute in question was ambiguous but capable of being read in a way that upheld its constitutionality, which is what we did. *See Pearson,* 205 Minn. at 554–55, 287 N.W. at 302. We stated that:

> [c]onceding that [the PP Act] is imperfectly drawn, the statute is nevertheless valid if it contains a competent and official expression of the legislative will. * * *
>
> * * * *
>
> Applying these principles to the case before us, it can reasonably be said that the language of * * * the act is intended to include those persons who, by a habitual course of misconduct in sexual matters, have evidenced an utter lack of power to control their sexual impulses.

*Id.* While ultimately reaching what I believe to be the wrong result, the court also followed these principles in *Linehan III* when it held that inability to control was not a factor to be considered.

On remand from the Supreme Court, the court now fails to follow these principles. The language of subdivision 18c(b) of the SDP Act is clear and unambiguous and expressly precludes consideration of the individual's inability to control their sexual behavior. *See* Minn.Stat. § 253B.02, subd. 18c(b); *see also Pearson,* 205 Minn. at 555–56, 287 N.W. at 302–03 (explaining that the court could not endorse "an unwarranted departure from the accepted meaning of the words defined"). The court may not read language out of

the statute in order to join the legislature's crusade to ensure Linehan's preventive detention.[12] When the court so blatantly disregards the legislature's intent as expressed in the statute's unambiguous language, it not only wears on the constitutional fabric of our law, it also tarnishes the credibility of this tribunal. The court's ongoing effort to keep Linehan confined through increasingly tortured interpretations of the Constitution and the SDP Act is shameless. As Thomas Paine said, "An avidity to punish is always dangerous to liberty." Paine, *supra*, at 588. I would add that it is also dangerous to the moral credibility of our criminal justice system. *See In re Blodgett,* 510 N.W.2d 910, 918 (Minn.1994).

As painful and as unpleasant as it may be, the SDP Act is unconstitutional and cannot be saved by construction. The language of the statute eliminates any requirement that the state prove that the person to be committed "has an inability to control [their] sexual impulses" and is applicable to all individuals irrespective of their ability to control their dangerous sexual behavior. *See Pearson,* 205 Minn. at 555, 287 N.W. at 302 (stating that "[i]t would not be reasonable to apply the provisions of the statute to every person guilty of sexual misconduct nor even to persons having strong sexual propensities. Such a definition would * * * make the act impracticable of enforcement"). Thus, the SDP Act can be distinguished from those statutes that "limit involuntary civil [commitment] to those who suffer from a volitional impairment rendering them dangerous beyond their control," and which the Supreme Court has said pass constitutional muster.[13] *Hendricks,* 521 U.S. at 358, 117 S.Ct. 2072.

In the final analysis, the court's decision to uphold the SDP Act symbolizes a process that is more concerned with short-term results than the long-term impact of a law that requires, based solely on a showing of future dangerousness, preventive detention of an individual who has served the sentence imposed by law for his past crimes. By its decision, the court has neither sought nor achieved justice. We are a nation of laws. If we base our constitutional jurisprudence on our desire to confine a particular individual, we have not only failed to protect that individual's rights, we have failed to protect the rights of all Minnesotans.

Therefore, I dissent.

LANCASTER, Justice (concurring in part and dissenting in part).

I concur in Part I of the majority opinion, holding that the SDP Act does not

---

**12.** I agree with the court that the legislature passed the SDP Act in the "wake of appellant's release" after this court's decision in *Linehan I.* The legislature, in effect, ordered Linehan's continued confinement by removing the inability to control standard. The legislature did so because of enormous public pressure. The court now endorses this denial of Linehan's freedom and his substantive due process rights because he is a potentially dangerous person and panders to what is politically expedient rather then to what is constitutionally permissible. *Cf. United States v. Will,* 449 U.S. 200, 218, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980) (stating that the role of Article III is to safeguard a litigants' "right to have claims decided by judges who are free from potential domination by other branches of government"); *Peterson v. Stafford,* 490 N.W.2d 418, 420 (Minn.1992) (stating that the goal of any system to select judges is "to create and maintain an independent judiciary as free from political, economic and social pressure as possible so judges can decide cases without those influences").

**13.** The court glosses over this distinction by stating both that the SDP Act does not require proof of an individual's inability to control his or her sexual behavior and that the legislature "shift[ed]" away from an utter inability to control requirement. This is precisely the point. The legislature shifted away from an utter inability to control requirement by eliminating altogether any consideration of the individual's inability to control their sexual behavior. Yet, in a vain attempt to save the statute, the court now adds consideration of that factor back into the statute.

violate the Ex Post Facto or Double Jeopardy Clause of the United States Constitution, and I agree with the majority's characterization of the United States Supreme Court's decision in *Kansas v. Hendricks,* 521 U.S. 346, 358, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (holding that the Kansas Sexually Violent Predator Act does not violate substantive due process, as the law allows civil commitment only for people "who suffer from a volitional impairment rendering them dangerous beyond their control"). However, I cannot accept the majority's interpretation of Minn.Stat. § 253B.02, subd. 18c(b) (1998), and therefore I respectfully dissent.

Minnesota's Sexually Dangerous Person Act, as the majority correctly states, closely resembles the Kansas act at issue in *Hendricks.* *Compare* Minn.Stat. § 253B.02, subd. 18c(a) (1998), *with* Kan. Stat. Ann. § 59–29a02 (1994 & Supp.1998). However, unlike the Kansas statute interpreted in *Hendricks,* the Minnesota SDP Act contains an additional provision that provides: "it is not necessary to prove that the person has an inability to control the person's sexual impulses." Minn.Stat. § 253B.02, subd. 18c(b).

The majority interprets subdivision 18c(b) under what it terms "well-settled canons of statutory construction" to reach the conclusion that subdivision 18c(b) should be read "very narrowly" to "mean only that the state does not need to prove that a person meets *Pearson*'s utter inability standard, thus differentiating the SDP Act from the PP Act or its successor statute, the SPP Act." I cannot subscribe to the methods of construction employed or the reasons presented by the majority to justify its decision. What the majority has accomplished is not an interpretation of subdivision 18c(b) but rather an amendment to the statute's plain meaning.

Our duty when reviewing acts of the legislature "is to ascertain and effectuate legislative intent. We presume that plain and unambiguous statutory language manifests legislative intent. If statutory language is plain and unambiguous, the court must give it its plain meaning." *In re Welfare of J.M.,* 574 N.W.2d 717, 721 (Minn.1998) (citations omitted). We have stated that if the legislature's intent is "clearly manifested by [the] plain and unambiguous language" of the statute, statutory construction is neither necessary nor permitted. *Ed Herman & Sons v. Russell,* 535 N.W.2d 803, 806 (Minn.1995). In *Commissioner of Revenue v. Richardson,* we said: "No room for judicial construction exists when the statute speaks for itself." 302 N.W.2d 23, 26 (Minn.1981).

Here we are confronted with a straightforward provision enacted by a legislature fully aware of our decisions and the controversy surrounding this law. The legislature wrote: "it is not necessary to prove that the person has an inability to control the person's sexual impulses." Minn.Stat. § 253B.02, subd. 18c(b). This language, on its face, can only be interpreted as having one meaning. The majority, through the use of statutory history and under the proviso of giving effect to all provisions of the SDP Act, abandons the plain meaning of the words enacted by the legislature and substitutes its own version, which in effect is an amendment – not an interpretation – of the SDP Act. Such amendments are impermissible and invade the province of the legislature. *See State v. Moseng,* 254 Minn. 263, 269, 95 N.W.2d 6, 11–12 (1959) (stating that statutes may not be construed so as to substitute amendment for statutory construction).

Perhaps the most persuasive argument demonstrating why the majority should refrain from doing (or redoing) the work of the legislature can be found in our statutes. The legislature in section 645.16 has promulgated rules to be used in the interpretation of statutes. "When the words of a law in their application to an existing

situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the *pretext of pursuing the spirit."* Minn.Stat. § 645.16 (1998) (emphasis added). The legislature's own words preclude us from going beyond the plain language contained in the SDP Act to effectuate what may or may not have been the legislative purpose. In doing so, the majority has ignored well-settled canons of construction in favor of interjecting meaning into the SDP Act, specifically subdivision 18c(b), when the language of the statute is clear and unambiguous.

More than 50 years ago, Justice Peterson, dissenting from an opinion interpreting the Workmen's Compensation Act, wrote:

> Where, as here, the words of the act are plain and the legislative purpose manifest, it is not permissible to seek a hidden meaning at variance with the language used and to engraft such meaning on the statute. Such construction leads to amendment of the statute rather than ascertainment of the legislative intent.

*Gleason v. Geary,* 214 Minn. 499, 516, 8 N.W.2d 808, 816 (1943) (Peterson, J., dissenting).

Because subdivision 18c(b) does not require the state to demonstrate that Linehan has an "inability to control [his] sexual impulses," I would hold that the statute violates Linehan's substantive due process rights and declare it unconstitutional in light of the Supreme Court's decision in *Hendricks.*

PAUL H. ANDERSON, J. (concurring in part and dissenting in part).

I join in the concurrence and dissent of Justice Lancaster.