**In the Matter of the CIVIL COMMITMENT OF James Allen MARTIN.**

Nos. C3–02–2236, CX–03–168.

Court of Appeals of Minnesota.

May 20, 2003.

Robert M.A. Johnson, Anoka County Attorney, John L. Kirwin, Special Assistant County Attorney, Minneapolis, MN, for appellant.

Ronald L. Greenley, Nicol & Greenley, Ltd., Assistant Anoka County Public Defender, Anoka, MN, for respondent.

Considered and decided by HALBROOKS, Presiding Judge, HARTEN, Judge, and STONEBURNER, Judge.

## OPINION

HARTEN, Judge.

Appellant Anoka County challenges the district court's denial of a petition to have respondent James Martin committed as a sexually dangerous person; respondent argues that Minn.Stat. § 253B.02, subds. 7a, 18c (2002), the sexually dangerous person statute, is unconstitutional as applied to him.[1] Because we conclude that the statute is constitutional as applied to respondent but that the district court erred in finding that respondent's acts did not constitute harmful sexual conduct and that there was not clear and convincing evidence that respondent has an inability to adequately control his sexual behavior, we reverse and remand.

## FACTS

Respondent James Martin, now 34, has a history of sexual behavior issues that began in early 1991, when respondent was a senior in college. At that time, respondent was living in a dormitory with a roommate. Respondent was depressed; his grades had deteriorated, he was feeling less motivated, he had gained weight, and he had occasional thoughts of suicide.

Respondent learned that, from a friend's dormitory room window, he could watch J.V., a female student, undress and walk around unclothed in her dormitory room. Respondent watched J.V. twice, and he began masturbating when fantasizing that J.V. was exhibitionistic and that she acted as she did because she wanted a boyfriend. Although he had not met J.V., respondent telephoned her, told her that he liked her

---

1. Both parties filed appeals, which were con- solidated by this court's order.

and had seen her unclothed, and asked her for a date. J.V. refused; her refusal made respondent angry because he attributed it to his weight gain.

Respondent's anger toward J.V. developed into hatred. He persuaded his roommate to invite J.V. to their dorm room, where respondent confronted her with disparaging remarks and racial slurs. In response, J.V. slapped respondent across the face and left. Respondent had secretly taped this incident, labeling the tape "Revenge on [J.V.]." Immediately after the incident, respondent felt victorious, but the following day he became more depressed and angry with J.V. He started blaming J.V. for everything wrong with his life and began thinking of ways to kill her.

In summer 1991, respondent learned where J.V. lived with her family and that she worked at a bar. Respondent went to the bar and approached J.V. in the parking lot. J.V. appeared uncomfortable and told respondent to stay away from her. After that encounter, respondent's anger toward J.V. intensified.

In July 1991, respondent broke into J.V.'s family's house when no one was home. He walked around the house, found J.V.'s bedroom, and sat on her bed with a .38 caliber pistol waiting for her to return. J.V. did not return and, after about 90 minutes, respondent left. In August 1991, respondent again visited J.V.'s family's house. Movement inside the house frightened him away as he was cutting a screen in an attempt to break in. About a week later, he returned to J.V.'s house for the third time. He parked at the end of the driveway and walked up to the door with a hunting knife. Although he had intended to break in, he returned to his car. J.V.'s neighbor saw respondent sitting in the car at the end of the driveway. When respondent drove away, the neighbor and J.V.'s father followed him. Respondent fired three pistol shots at their car. One shot hit the windshield, but no one was injured.

Respondent remained in the area for a few days, living in his car and fantasizing about killing J.V. He was apprehended by authorities when his car got stuck in the mud. A search of the car revealed a loaded .38 caliber pistol with extra ammunition, a hunting knife, a roll of duct tape, three lengths of rope, four tent stakes, a bull whip, a bottle of Vaseline, a pair of cotton gloves, a pair of latex gloves, a spade, a video camera and tripod, and the video cassette labeled "Revenge on [J.V.]."

Becker County authorities charged respondent with two counts of second-degree assault, to which he pleaded guilty. At respondent's request, a psychiatric examination was performed by Edwin Johnson, M.D. and R.P. Ascano, Ph.D. Respondent told the doctors that he intended to kidnap, rape, and kill J.V. using the items found in his car. Drs. Johnson and Ascano diagnosed respondent with major depressive disorder, recurrent, and avoidant personality disorder with schizotypal features. They also found a serious risk that respondent would commit suicide and a moderate risk that he would commit homicidal behavior.

In a presentence investigation report, a probation officer noted that respondent's emotions seemed flat until he began describing the incidents involving J.V. He then became excited and appeared to enjoy recalling the humiliation and fear he inflicted on her and her family.

The Becker County District Court sentenced respondent to 72 months on one count of second-degree assault and stayed a 36–month sentence on the second count on condition that respondent successfully complete a psychological treatment program that would deal with the issues identified by Drs. Johnson and Ascano.

In February 1992, respondent entered the Minnesota Correctional Facility–St. Cloud. Despite staff recommendations, he refused to participate in any treatment programs. In 1993, respondent began engaging in obsessive behavior toward a female prison guard, J.C. Because respondent was perceived to be at risk for suicide, he was assigned to a cell near the guard desk. When J.C. was seated at the desk, respondent often stared at her, contorting himself into uncomfortable positions so he could do so. He continued to stare at her after she confronted him about his conduct. When J.C. had respondent moved to a different cell, he stood with his face up against the bars of the cell to stare at her. Respondent often asked J.C. questions about her personal life, followed her around the cell unit, stood inappropriately close to her, and stared at her body. Respondent told another inmate that, when he got out of prison, he intended to ask J.C. to marry him and to kill her if she refused. Alarmed by what respondent told him, the inmate reported respondent's remark to prison staff. J.C. believed there was a strong possibility that respondent would pursue her when he got out of prison.

After an evaluation by the prison's chief psychologist, respondent voluntarily agreed to participate in the sex offender program at the Minnesota Correctional Facility–Oak Park Heights. He quit the treatment program before completing it. Program staff rated respondent's prognosis as poor, and he was transferred back to the St. Cloud facility. After less than a month, he was returned to Oak Park Heights because of predatory and assaultive behavior.

Because respondent had failed to complete treatment pursuant to the conditions of the stay on his sentence, the Becker County District Court executed that sentence, finding that respondent presented a clear and present danger to the public if he was released without treatment and that the interest of public safety required him to remain incarcerated.

Respondent was admitted into the Minnesota Correctional Facility–Stillwater, where he again refused to participate in sex offender treatment. He was transferred to the Prairie Correctional Facility in Appleton but, after he threatened and assaulted prison staff, he was transferred back to St. Cloud.

On 23 October 1997, respondent was released to live at his mother's house under intensive supervised release (ISR). In prison, respondent learned that J.C. had filed a sexual harassment suit against the St. Cloud correctional facility. Unbeknownst to his ISR agent, respondent twice visited the county court administrator's office to review J.C.'s court file.

On 31 December 1997, respondent's ISR agent gave him permission to leave the house to run some errands. Respondent purchased a shotgun, returned to the court administrator's office, and unlawfully took court documents from J.C.'s file, including a psychological evaluation of J.C. On 5 January 1998, respondent was apprehended at the home of a friend. Authorities found a can of pepper spray and a steak knife in respondent's jacket pocket, and a loaded shotgun, a pair of handcuffs, and a roll of duct tape in his car. Inside the friend's home, authorities found the stolen court file documents and two lists of names, some of which had home addresses. One list included prison officials, judges, attorneys, and others who had been involved with respondent during his time in the criminal justice system; the other included people with the same last name as J.C. who lived near the St. Cloud correctional facility.

Respondent reported to the ISR agent that he initially intended to go after J.C. and that he had seriously considered killing himself. He pleaded guilty to the federal charge of being a felon in possession of a firearm and received a 52–month sentence. He also pleaded guilty to the state charge of gross misdemeanor interference with property in official custody; the court imposed a one-year sentence to run concurrently with the federal sentence.

Over the next three years, in county jail and federal prison, respondent had repeated disciplinary problems and received no psychological or sex offender treatment. He was released from federal prison in December 2001 and taken to the Minnesota Security Hospital (MSH). His behavior was again out of control; his behavior analyst noted that he remained at high risk for assaultive and dangerous behavior.

On 12 December 2001, appellant Anoka County filed a petition to have respondent committed as a sexually dangerous person (SDP) or as mentally ill and dangerous to the public (MI & D).[2] The district court appointed forensic psychologist James Gilbertson, Ph.D., to perform a psychological evaluation of respondent, and respondent selected forensic psychologist Paul Reitman, Ph.D., to perform an evaluation on his behalf. Dr. Gilbertson concluded that respondent met the statutory requirements for commitment as a SDP, but Dr. Reitman concluded that he did not.

Trial on the commitment petition lasted from 18 March through 1 April 2002. On 30 July 2002, the district court declined to commit respondent as a SDP but committed him as MI & D to the MSH. MSH doctors evaluated respondent and concluded that he was not properly committed as MI & D because he was not mentally ill.

On 27 November 2002, the district court issued an order declining to commit respondent as MI & D. Appellant then moved to have the district court's 30 July 2002 order amended to commit respondent as a SDP. On 20 December 2002, the district court denied appellant's motion. Appellant now challenges the district court's decision not to commit respondent as a SDP; respondent contends that the relevant statutes are unconstitutional as applied to him.

## ISSUES

1. Did the district court err in finding that respondent's conduct toward J.C. was not "harmful sexual conduct" within the meaning of Minn.Stat. § 253B.02, subd. 7a(a) (2002), and Minn.Stat. § 253B.02, subd. 18c(a)(1) (2002)?

2. Did the district court err in concluding that evidence of other possible causes of serious emotional harm rebutted the Minn.Stat. § 253B.02, subd. 7a(b) (2002), presumption of a substantial likelihood that J.C., a victim of respondent's stalking/harassment, suffered serious physical or emotional harm?

3. Did the district court err in determining that the record does not support a conclusion that respondent cannot adequately control his sexual impulses and behavior?

4. Is Minn.Stat. § 253B.02, subds. 7a, 18c (2002), constitutional as applied to respondent?

## ANALYSIS

### 1. Harmful Sexual Conduct

 Minn.Stat. § 253B.02, subd. 18c (a) (2002) provides that a " 'sexually dan-

---

**2.** The initial petition that was filed on 12 December 2001 was dismissed without prejudice on 5 March 2002 for failure to comply with statutory time periods. Appellant refiled a nearly identical petition later that day.

gerous person' means a person who * * * has engaged in a course of harmful sexual conduct as defined in subdivision 7a * * *." Minn.Stat. § 253B.02, subd. 7a (2002), provides that:

(a) "Harmful sexual conduct" means sexual conduct that creates a substantial likelihood of serious physical or emotional harm to another.

(b) There is a rebuttable presumption that [certain] conduct * * * creates a substantial likelihood that a victim will suffer serious physical or emotional harm * * * [i]f the conduct was motivated by the person's sexual impulses * * *.

The district court based its determination that respondent is not a sexually dangerous person in part on its conclusion that he did not engage in harmful sexual conduct with respect to J.C. in 1997 and 1998. A district court's conclusions regarding whether the record supports, by clear and convincing evidence, the requirements of the SDP statute are questions of law that we review de novo. *In re Linehan*, 544 N.W.2d 308, 312 (Minn.App.1996), *aff'd* 557 N.W.2d 171 (Minn.1996), *vacated on other grounds*, 522 U.S. 1011, 118 S.Ct. 596, 139 L.Ed.2d 486 (1997).

The district court concluded that respondent's behavior toward J.C. after he was released from prison in 1997 was not "harmful sexual conduct" within the meaning of Minn.Stat. § 253B.02, subd. 7a, because it was motivated by revenge, not by sexual impulses. But the record shows that respondent violated the terms of his supervised release, took court documents relating to J.C.'s sexual harassment case from the administrator's office, and was apprehended possessing a shotgun, handcuffs, duct tape, mace, and a steak knife. Moreover, respondent professed to Dr. Reitman in 1998 that he was still sexually attracted to J.C. and that he fantasized

about her; Dr. Reitman testified that respondent's behavior toward J.C. in 1997 closely mirrored his conduct toward J.V. in 1991. Drs. Reitman and Gilbertson both concluded that respondent's behavior toward J.C. after he left prison in 1997 was motivated by sexual impulses.

Respondent has a documented history, beginning with his behavior toward J.V. and continuing through various female correctional officers, of sexual obsession toward women. Accordingly, we conclude that respondent's conduct toward J.C. when he was released from prison in 1997 was motivated by sexual impulses, as found by both experts.

## 2. Presumption of Likelihood of Serious Emotional Harm

■ Minn.Stat. § 253B.02, subd. 7a(b) provides:

There is a rebuttable presumption that [certain] conduct * * * creates a substantial likelihood that a victim will suffer serious physical or emotional harm * * *. If the conduct was motivated by the person's sexual impulses or was part of a pattern of behavior that had criminal sexual conduct as a goal, the presumption also applies to conduct described in section * * * 609.749, subdivision 3 or 5 (HARASSMENT AND STALKING).

The district court found that respondent's conduct towards J.C. while he was at the St. Cloud correctional facility was harassment and stalking, but concluded that the statutory presumption was rebutted by the fact that it was impossible to tell whether J.C.'s emotional harm was caused by respondent or by the hostile work environment then existing at the facility.

■ Our examination of the evidence leaves no doubt that respondent's actions toward J.C. while he was in prison created

a substantial likelihood of serious emotional harm to her. The incident reports she filed regarding his conduct show that he systematically and continually harassed her and that his harassment left her seriously emotionally upset and fearing for her life. We note that the Minn.Stat. § 253B.02, subd. 7a(b), presumption is not that a victim actually suffers serious emotional harm as a result of a defendant's conduct; it is that the conduct creates a substantial likelihood of serious emotional harm. Here, respondent's conduct not only created a substantial likelihood of serious emotional harm; his conduct actually inflicted such harm on J.C., thereby surpassing the statutory presumption. On this record, we conclude that the fact that J.C. may simultaneously have been subjected to sexual harassment from her coworkers is insufficient to overcome the presumption that respondent's conduct was harmful sexual conduct within the meaning of Minn.Stat. § 253B.02, subd. 7a.

### 3. Ability to Control Sexual Impulses or Behavior

[T]he Sexually Dangerous Person [SDP] Act, Minn.Stat. § 253B.02, subd. 18c (1998), requires a finding that a person lacks some control over his or her sexually dangerous actions * * *.

*In re Linehan,* 594 N.W.2d 867, 868 (Minn. 1999) (*Linehan IV* ).

[T]he SDP Act allows civil commitment of sexually dangerous persons who have engaged in a prior course of sexually harmful behavior and whose present disorder or dysfunction does not allow them to adequately control their sexual impulses * * *.

*Id.* at 876. An appellate court determines whether a commitment is supported by clear and convincing evidence. *See, e.g., id.* (reviewing whether lack of adequate control over sexually harmful behavior was established by clear and convincing evidence). The district court concluded that the record did not demonstrate by clear and convincing evidence that respondent could not adequately control his sexual impulses or behavior.

The evidence provided by both Drs. Gilbertson and Reitman was that respondent suffers from adult antisocial behavior and a personality disorder, not otherwise specified, with paranoid, narcissitic, and antisocial traits. Dr. Reitman testified that respondent's psychological disorders affect his ability to control his harmful sexual behavior (stalking-type behavior), and quantified the inability to control at about 50%. Dr. Reitman also testified that impulsivity and inability to defer acting out are characteristics of respondent's personality disorder. Dr. Gilbertson testified that respondent's psychological disorders affect his ability to control his harmful sexual behavior and stated that respondent lacks adequate control over his ability to refrain from engaging in harmful sexual behavior.

A review of respondent's sexual behavior since 1991 supports the experts' opinions that respondent cannot adequately control his sexual impulses: he broke into one victim's home repeatedly after planning and equipping himself to abduct, rape, and murder her; he stalked and harassed a female guard at the facility where he was incarcerated; he told another inmate that he would kill the guard if she refused to marry him; he later bought a shotgun, stole court documents relating to the guard, and compiled a list of people with the guard's last name who lived near the facility; he has continually engaged in harassing, violent, and threatening behavior to females in correctional facilities and MSH.

Again, we conclude that the evidence here compels a finding that respondent's

personality disorder does not allow him to adequately control his harmful sexual impulses and behavior.

> [T]he SDP Act allows civil commitment of sexually dangerous persons * * * whose present disorder or dysfunction does not allow them to adequately control their sexual impulses, making it highly likely that they will engage in harmful sexual acts in the future.

*Id.* at 876. Having concluded that respondent did not lack adequate control of his sexual impulses, the district court did not determine the likelihood of his engaging in harmful sexual acts in the future. In light of our decision to the contrary, we remand to the district court to determine the likelihood of respondent's future harmful sexual acts.

### 4. Constitutionality of SDP Act as Applied to Respondent[3]

 Respondent argues that, if this court concludes that he is subject to commitment as an SDP, Minn.Stat. § 253B.02, subds. 7a, 18c, is unconstitutional as applied to him because it is void for vagueness and because it violates substantive due process, procedural due process, double jeopardy, and equal protection. We see no merit in these claims.

 "Courts should exercise extreme caution before declaring a statute void for vagueness." *Hard Times Cafe, Inc. v. City of Minneapolis,* 625 N.W.2d 165, 171 (Minn.App.2001) (citation omitted). Respondent argues that the phrase "harmful sexual conduct" in Minn.Stat. § 253B.02, subd. 7a, is vague because, in his case, it is applied to nonsexual conduct. He claims that he is being committed as a sexually dangerous person when he has not been convicted of any sexual offense. But re-

spondent pleaded guilty to two counts of second-degree assault and admitted that his goal in assaulting J.V. was to commit criminal sexual conduct by raping her. We conclude that the phrase "harmful sexual conduct" is not vague as applied to respondent.

 Respondent's substantive due process argument was explicitly addressed by the Minnesota Supreme Court in *Linehan IV,* 594 N.W.2d at 872–876.

> States have a compelling interest in both protecting the public from sexual violence and rehabilitating the mentally ill. * * * [The issue is] whether * * * the SDP Act is narrowly tailored to meet these interests.
>
> \* \* \* \*
>
> * * * [W]e held in *Linehan III [In re Linehan,* 557 N.W.2d 171 (Minn.1996) ] that the newly enacted SDP Act did not require proof that the proposed patient has an inability to control his or sexual impulses in order to uphold civil commitment. * * *
>
> \* \* \* \*
>
> * * * [This] provision * * * should be read very narrowly * * * to mean only that the state does not need to prove that a person meets the * * * utter inability standard[.] * * * Such a reading harmonizes all parts of the statute and acknowledges the legislature's intent to abandon the utter lack of control test required for commitments under the [prior act] while insuring that the statute is narrowly tailored.

*Id.* (citations and quotations omitted). We conclude that the SDP Act does not violate substantive due process.

---

**3.** In view of its holding, the district court did not address the constitutionality of the SDP Act. Because the parties presented and

briefed the constitutional issues for this appeal, we review them in the interests of justice under Minn. R. Civ.App. P. 103.04.

Nor does it violate procedural due process. Respondent argues that he is entitled to due process on the criminal sexual conduct charges before he is committed on the basis of those charges. But the basis for respondent's commitment is that, upon his own guilty pleas, he was convicted of two counts of assault in the second degree—both assaults being motivated by the goal of committing acts of criminal sexual conduct. *See* Minn.Stat. § 253B.02, subd. 7a(b) (rebuttable presumption that assault in the second degree, if motivated by sexual impulses or part of a pattern of behavior that has criminal sexual conduct as its goal, creates a substantial likelihood that a victim will suffer serious physical or emotional harm and is therefore harmful sexual conduct). We conclude that respondent received due process on the assault charges; his rights to procedural due process have not been violated.

Finally, respondent argues that his commitment under the SDP Act violates double jeopardy and equal protection. The Minnesota Supreme Court addressed both arguments in *In re Linehan,* 557 N.W.2d 171 (Minn.1996), *vacated on other grounds,* 522 U.S. 1011, 118 S.Ct. 596, 139 L.Ed.2d 486 (1997) (*Linehan III* ). Protections against double jeopardy are not implicated by the SDP Act, because the purpose of commitment under the SDP act is treatment and not punishment. *Id.* at 188. The SDP Act's classification of sexually dangerous persons is justified by "the reasonable connection between a proposed patient's mental disorder and the state's interests in public protection and treatment." *Id.* at 187.

### DECISION

We reverse the district court's determinations that precluded respondent's commitment under the SDP Act, and remand for the district court to determine the remaining issue of whether it is highly likely that respondent will engage in future harmful sexual conduct. The district court may, in its discretion, reopen the record. We also conclude that none of respondent's constitutional challenges to the SDP Act has merit.

**Reversed and remanded.**