**In the Matter of the CIVIL COMMITMENT OF Adnan Allen Fakaraldin STONE.**

**No. A05–2043.**

Court of Appeals of Minnesota.

April 4, 2006.

Mike Hatch, Attorney General, Noah A. Cashman, Assistant Attorney General, St. Paul, MN; and Larry Collins, Waseca County Attorney, Waseca, MN, for appellant State of Minnesota.

Jennifer J. Dunn–Foster, Dow, Einhaus, Mattison & Carver, P.A., Owatonna, MN, for respondent Adnan Allen Fakaraldin Stone.

Considered and decided by LANSING, Presiding Judge; SHUMAKER, Judge; and HALBROOKS, Judge.

## OPINION

LANSING, Judge.

The state appeals the district court's denial of a petition for the civil commitment of Adnan Stone as a sexually dangerous person. The district court denied the petition based on its finding that Stone's actions did not form a course of harmful sexual conduct because the factual circumstances of Stone's 1998 sexual assaults were not similar to the factual circumstances of his 2004 criminal-sexual-conduct conviction. Because clear and convincing evidence established that Stone engaged in a sequence of harmful sexual conduct over an extended period of time and that this conduct is linked to an existing mental disorder that makes it highly likely that he will engage in harmful sexual conduct in the future, we reverse the denial of the petition to commit Stone as a sexually dangerous person.

## FACTS

The state filed a petition on May 27, 2005, for the civil commitment of Adnan Stone as a sexually dangerous person and sexual psychopathic personality. To support its petition, the state relied on evidence of Stone's sexual conduct with young girls and the evaluation and reports of two court-appointed medical examiners.

Stone's first sexual assault occurred in February 1998 when Stone was twelve years old and living in a foster home. Stone admitted that he sexually assaulted his four-year-old foster sister, KS, at least three separate times. Each incident began with Stone fondling KS's buttocks and torso and then escalated. In a consultation report, KS said that Stone penetrated her vagina with his penis and rubbed his penis against her buttocks. Despite initial denials, Stone admitted to engaging in inappropriate sexual conduct but said that he did not penetrate KS. He instead claimed he had KS lie with her face down on the bed, placed his penis between her upper thighs against her vagina, and rubbed. He maintains that his conduct was not the result of sexual desire, but instead part of his efforts to be removed from the foster home.

The state charged Stone with first- and second-degree criminal sexual conduct, and Stone pleaded guilty to fifth-degree criminal sexual conduct. The court ordered him to participate in outpatient sexual offender treatment, and he successfully completed the program.

In the ensuing years, Stone was involved in a number of incidents of aggression against young girls. In 2001, when he was sixteen, he brandished a knife at a thirteen-year-old girl who encouraged her fourteen-year-old friend to stop seeing

Stone. The incident resulted in a conviction of fifth-degree assault. In 2003 the district court issued a harassment restraining order against Stone because he followed, pursued, or stalked JPW, a fourteen-year-old girl. Stone violated this order by continuing to have phone contact with JPW.

In January 2004, when Stone was eighteen years old, he engaged in sexual relations with KMT, a fifteen-year-old girl who suffers from multiple mental-health conditions. KMT and Stone, who knew that KMT was only fifteen, were at a house with a group of friends. KMT testified that she was intoxicated and had taken several prescription medications. Witnesses, including Stone, saw KMT drink a shot of liquor and then drink twice from the bottle. They prevented her from drinking more because she began to act "goofy." KMT left the group to lie down in one of the bedrooms. Stone followed her into the bedroom. KMT claims she told Stone that she could not have sexual relations with him and that she lost consciousness. She later testified, however, that she was awake and aware when the sexual contact occurred but that she did not want to have sex with Stone. When she awoke in the early morning, she discovered that her pants and underwear were around her knees and that she had pain and bleeding in her vaginal region.

Although Stone acknowledges that KMT was too young to legally consent to having sex with him, he asserts that the sex was voluntary. Stone provided an affidavit from Amy Larson, who was at the house when the events occurred. Although Larson remained in the living room while Stone and KMT were in the bedroom, her affidavit generally supported Stone's claims that KMT voluntarily engaged in sex with him, that KMT rejoined the group later in the evening, and that she did not appear upset.

The state charged Stone with first- and third-degree criminal sexual conduct. Stone pleaded guilty to third-degree criminal sexual conduct. As a condition of probation imposed in May 2004, the court ordered Stone to refrain from any contact with persons under the age of eighteen except in the presence of a parent or work supervisor.

Stone violated the conditions of his probation several times in 2004 by contacting young girls and spending unsupervised time in the presence of minors. In May, only two weeks after the issuance of the probation order, Stone contacted a sixteen-year-old girl and spent several hours alone with her. In December he called a fifteen-year-old girl and told her that he wanted to "jump her." Shortly after this phone conversation, the girl became frightened when she saw Stone outside her home. In February 2005 Stone's probation officer filed a violation report because Stone failed to provide notice of his change in residence, continued to have contact with persons under the age of eighteen in violation of his probation conditions, and continued to use drugs.

Based on Stone's conduct, the state filed a petition for civil commitment as a sexually dangerous person (SDP) and as a sexual psychopathic personality (SPP). The district court appointed two experts to examine Stone, Dr. Linda Marshall and Dr. Peter Meyers. These experts both submitted reports that included their evaluations, the results of several tests, and their conclusions. They also provided expert testimony at the commitment hearing. Both experts agreed that Stone qualified as a sexually dangerous person but disa-

greed on whether he qualified as a sexual psychopathic personality. They concluded that he suffers from a number of mental disorders.

The district court denied the state's petition, concluding that the state failed to prove by clear and convincing evidence that Stone met the requirements for commitment as either an SDP or an SPP. In deciding that Stone does not qualify as an SDP, the district court determined that the state failed to prove he engaged in a course of harmful sexual conduct. The court concluded, however, that Stone suffers from chemical dependence, a conduct disorder, an oppositional disorder, a reactive attachment disorder, and an antisocial personality disorder. It further concluded that, because of these disorders, Stone is very likely "to engage in criminal activity [and, if] the situation presents itself, the criminal activity may well be sexual." The state appeals the denial of its petition for the SDP commitment.

## ISSUES

1. Did the record, as determined by the district court, contain clear and convincing evidence that Stone engaged in a course of harmful sexual conduct?

2. Did clear and convincing evidence establish that Stone is highly likely to engage in harmful sexual conduct?

## ANALYSIS

■ On a petition for civil commitment under the Minnesota Commitment and Treatment Act, the state must prove the need for commitment with clear and convincing evidence. Minn.Stat. § 253B.18, subd. 1(a) (2004). We review the district court's factual findings under a clear-error standard. Minn. R. Civ. P. 52.01; *In re Joelson,* 385 N.W.2d 810, 811 (Minn.1986). But a finding of fact that is controlled or influenced by an error of law will be set aside. *Webb Bus. Promotions, Inc. v. Am. Elecs. & Entm't Corp.,* 617 N.W.2d 67, 73 (Minn.2000). The determination of whether the facts satisfy the statutory standard for civil commitment is a question of law subject to de novo review. *In re Linehan,* 518 N.W.2d 609, 613 (Minn.1994) (*Linehan I* ).

■ A sexually dangerous person is defined as a person who: (1) engaged in a course of harmful sexual conduct; (2) manifests a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct. Minn.Stat. § 253B.02, subd. 18c(a) (2004). A sexually dangerous person is subject to civil commitment only if the person's disorder or dysfunction does not allow adequate control over sexual impulses and makes it highly likely that the person will reoffend. *In re Linehan,* 594 N.W.2d 867, 876 (Minn.1999) (*Linehan IV).* The parties do not dispute the district court's conclusion that Stone manifests a qualifying disorder, and the record supports this determination. We therefore limit our analysis to the remaining elements.

### I

The district court concluded that Stone did not engage in a course of harmful sexual conduct because the "nature of the assault on KS and KMT are not similar" and because Stone's other conduct with young girls was not sexual in nature. "Harmful sexual conduct" is statutorily defined as "sexual conduct that creates a substantial likelihood of serious physical or

emotional harm to another." Minn.Stat. § 253B.02, subd. 7a(a) (2004). The statute provides that criminal sexual conduct in the first through fourth degree results in a rebuttable presumption that the conduct "creates a substantial likelihood that a victim will suffer serious physical or emotional harm." *Id.*, subd. 7a(b). The presumption is not that a victim actually suffers serious emotional harm, but that the conduct creates a substantial likelihood of such harm. *In re Civil Commitment of Martin,* 661 N.W.2d 632, 639 (Minn.App. 2003), *review denied* (Minn. Aug. 5, 2003).

The statute does not define "course" or specify the number of incidents necessary to qualify as a course. *In re Civil Commitment of Ramey,* 648 N.W.2d 260, 268 (Minn.App.2002), *review denied* (Minn. Sept. 17, 2002). Minnesota caselaw, however, indicates that "course" is a "systematic or orderly succession; a sequence." *Id.; see also American Heritage Dictionary* 419 (4d ed.2000) (defining course to be sequence or succession of systematic or orderly events). The district court incorporated into its application of the statutory term "course of harmful sexual conduct" a requirement that the sexual conduct be similar to constitute a course. We recognize that the statutory factors necessary to allow for SPP commitment include a requirement that the petitioner establish a "habitual course of misconduct." Minn.Stat. § 253B.02, subd. 18b (2004). This factor in the SPP statute has been defined to require evidence of a pattern of similar conduct. *See In re Blodgett,* 510 N.W.2d 910, 915 (Minn.1994) (considering frequency and similarity of incidents to determine whether party should be committed as SPP). But the factors necessary for commitment under the SPP statute are structured differently from the fac-

tors necessary for commitment under the SDP statute, and the standard of "habitual course of conduct" used in the SPP statute does not equate to the standard of "course of harmful sexual conduct" used in the SDP statute.

▪ Courts applying the SPP statute have interpreted the use of the modifying adjective "habitual" to entail a concept of similarity or pattern. *See In re Bieganowski,* 520 N.W.2d 525, 529–30 (Minn.App. 1994) (evaluating habitual nature of sexual conduct by considering similarities between incidents and pattern of conduct), *review denied* (Minn. Oct. 27, 1994). But the word "habitual" does not appear in the SDP statute, and we may not, in construing a statute, ignore its plain language and insert a requirement that is not there. *See Phelps v. Commonwealth Land Title Ins. Co.,* 537 N.W.2d 271, 274 (Minn.1995) (stating that, when language of statute is plain, court should not construct statute to include words that were omitted). The state is required to establish by clear and convincing evidence all of the elements required for involuntary commitment under the SDP statute, including a course of conduct that satisfies the definition of harmful sexual conduct, but it is not required to show that the incidents of harmful sexual conduct are the same or similar harmful sexual conduct.

▪ An examination of whether an offender engaged in a course of harmful sexual conduct takes into account both conduct for which the offender was convicted and conduct that did not result in a conviction. *Ramey,* 648 N.W.2d at 268. Because the statute considers a course of conduct, the incidents that establish the course will have occurred over a period of time and need not be recent. *In re Irwin,*

529 N.W.2d 366, 374 (Minn.App.1995), *review denied* (Minn. May 16, 1995). And the existence of a period in which a person has not committed sex offenses does not preclude a determination that he engaged in a course of sexual misconduct. *In re Robb,* 622 N.W.2d 564, 573–74 (Minn.App. 2001), *review denied* (Minn. Apr. 17, 2001).

To determine whether Stone has engaged in a course of harmful sexual conduct, we must first compare the facts of each of the established incidents, viewed in the light most favorable to the district court's conclusions, to the statutory definition of harmful sexual conduct. We then consider whether the incidents of qualifying conduct together constitute a course of harmful sexual conduct.

■ The incidents of sexual abuse that Stone inflicted on KS resulted in a conviction of fifth-degree criminal sexual conduct, which does not create a rebuttable presumption of harmful sexual conduct. The district court made no factual findings of the extent of the sexual abuse or the degree of harm that KS suffered. In the absence of these findings, we examine whether the evidence clearly and convincingly established that she is likely to suffer serious emotional harm.

Even if we accept Stone's assertion that he did not sexually penetrate the child, the evidence nonetheless established that she is likely to suffer serious emotional harm. KS's young age, the repeated incidents, the escalating and different types of abuse, and her relationship with Stone, her foster brother, were all factors that led the two court-appointed experts to conclude that she was likely to sustain serious emotional harm with long-term effects. This harm may include psychological disorders, such as posttraumatic stress

and depression, which may increase the likelihood of suicide or chemical dependency. The expert testimony noted that KS was experiencing nightmares and was fearful of being separated from her parents. The expert testimony combined with the specific indications of the harmful effects on KS demonstrate that KS is likely to suffer serious long-term emotional harm, and the incidents therefore qualify as harmful sexual conduct.

■ The sexual misconduct involving KMT also includes evidence of long-term emotional harm. Because Stone was convicted of third-degree criminal sexual conduct, a rebuttable presumption exists that he engaged in harmful sexual conduct. In evaluating the long-term emotional harm, the district court did not address the presumption, but rejected KMT's statements about her incapacitation or her physical injury at the time of the assault. We therefore rely on Stone's version of the event, that KMT was conscious and wanted to engage in sexual relations. This construction of events, however, does not rebut the presumption that fifteen-year-old KMT was likely to suffer long-term emotional harm. The expert witnesses testified that KMT was vulnerable, that she was humiliated by the encounter, that she suffers from posttraumatic stress, and that she will suffer long-term emotional harm. The experts also stated that, even if they accepted Stone's version of events, they still concluded that KMT is likely to suffer severe emotional harm as a result of the incident because of the resulting trauma and negative perception of the encounter. The evidence in the record therefore supports the presumption, rather than rebutting it. We conclude that the uncontradicted expert testimony provided clear and convincing evidence that KMT is likely to

suffer severe emotional harm as a result of Stone's sexual misconduct.

We now turn to Stone's remaining incidents involving other young girls to determine whether these actions qualify as harmful sexual conduct. The district court concluded that only one of the acts qualified as harmful sexual conduct because the other incidents were not sexual in nature. The incident that the district court concluded was sexual in nature was Stone's violation of his probation by telephoning a young girl and telling her that he wanted to "jump her." Dr. Meyers testified that this conduct was harmful. See Martin, 661 N.W.2d at 638 (observing that sexually motivated stalking behavior amounts to course of harmful sexual conduct). Although both experts testified that Stone's other interactions with young girls, including the incident in which he brandished a knife, were sexual in nature, the district court found that they were not. The district court acts within its discretion in determining the credibility of expert testimony, and we defer to those assessments. See Joelson, 385 N.W.2d at 811 (stating that district court's "evaluation of credibility is of particular significance"); see also Alstores Realty, Inc. v. State, 286 Minn. 343, 353, 176 N.W.2d 112, 118 (1970) (noting that appellate courts should defer to district court determinations of weight and credibility of expert evidence). We therefore accept the district court's findings that Stone's sexual acts included the repeated assaults on KS, the assault on KMT, and the sexual comment directed at the young girl in violation of his probation.

Having concluded that these incidents qualify as harmful sexual conduct, we now consider whether the evidence clearly and convincingly established a course of harmful sexual conduct. The district court's finding that the conduct did not form a course of conduct was based on its legal conclusion that the conduct must constitute similar acts to be considered part of a course. This finding is therefore invalidated by our legal determination that the plain meaning of the statute requires that each act must constitute harmful sexual conduct but does not require that the harmful sexual conduct be precisely the same type or demonstrate a degree of similarity other than what is necessary to establish that it is harmful sexual conduct.

The evidence is uncontradicted that, although many of Stone's aggressive interactions with young girls did not involve sexual relations, these acts were nonetheless part of a course of harmful sexual conduct. The experts concluded that his behavior establishes a pattern of fixation on young girls and that his actions constitute a cycle of sexual abuse that is habitual and chronic. In formulating this opinion, they relied on the uncontradicted evidence of his repeated contact with young girls in violation of his probation and a restraining order, the vulnerability of the girls, and the continuation of this conduct, including the assault on KMT, after he had completed a treatment program.

Both experts concluded that, even accepting Stone's less inculpatory versions of the incidents involving KS and KMT, these incidents of sexual misconduct in the context of his fixation on, and his aggressive conduct toward, young girls established a course of harmful sexual conduct. No evidence contradicted the expert testimony or the specific incidents on which the expert witnesses based their opinions, and, aside from commenting on their reliance on police records, the district court did not discount their opinions or credibility. The

record establishes that the state met its burden to show by clear and convincing evidence that Stone engaged in a course of harmful sexual conduct. *See Barrera v. Muir*, 553 N.W.2d 104, 107 (Minn.App. 1996) (recognizing conclusive force of medical testimony when it is positive, consistent, unimpeached, and uncontradicted), *review denied* (Minn. Oct. 29, 1996).

## II

 In considering the third statutory element for commitment as an SDP, the district court concluded that Stone is very likely to engage in harmful sexual conduct in the future. We view the evidence in the light most favorable to this conclusion. *In re Linehan*, 557 N.W.2d 171, 189 (Minn.1996) (*Linehan III*), cert. granted, judgment vacated and case remanded, 522 U.S. 1011, 118 S.Ct. 596, 139 L.Ed.2d 486 (1997), *aff'd on remand*, 594 N.W.2d 867 (Minn.1999). To satisfy the third statutory element and to allow commitment as an SDP, the state must establish that Stone is "highly likely [to] engage in harmful sexual acts in the future." *Linehan IV*, 594 N.W.2d at 876. Regardless of whether the state seeks commitment as an SDP, which requires an examination of the likelihood that the offender will reoffend, or as an SPP, which depends on a conclusion of future dangerousness, the court must consider six factors. *Linehan III*, 557 N.W.2d at 189. When a court considers the probability that an offender will engage in future harmful sexual conduct, the court must evaluate: (1) the offender's demographic characteristics; (2) the offender's history of violent behavior; (3) the base-rate statistics for violent behavior among individuals with the offender's background; (4) the sources of stress in the offender's environment; (5) the similarity of the present or future context to those contexts in which the offender used violence in the past; and (6) the offender's record of participation in sex-therapy programs. *Linehan I*, 518 N.W.2d at 614.

The two court-appointed experts concluded that each of these commitment factors had been met. In considering Stone's demographic characteristics, the first factor, the experts concluded that Stone's age and lack of family support indicate that he is in a demographic likely to reoffend. On the second factor, they determined that he has a history of violent behavior based on his use of a knife to threaten a girl and the inherently violent nature of sexual assaults. For the third factor, the experts' analysis of the base-rate statistics indicates a high likelihood of reoffending, with a twenty-five-year recidivism rate ranging from thirty-nine to fifty-two percent. The experts concluded that for the fourth factor, Stone will face stress related to his living arrangements, his repeated violations of the law, the implications of being labeled a sex offender, and the presence of his girlfriend's young child. On the fifth factor, the experts noted that Stone is demonstrably incapable of learning from his mistakes and that he places himself in situations involving drugs, alcohol, and young girls, which are circumstances in which he is likely to reoffend. Finally, the expert witnesses stated that, although Stone completed a sexual-offender treatment program when he was thirteen, they consider him to be an untreated offender because he reoffended after the program and because he did not have a structured plan to avoid reoffending.

In reaching their conclusions, the expert witnesses testified they did not limit their analysis to the six *Linehan* factors, but also relied on a number of observations and psychological tests that show Stone to

be highly likely to reoffend. They observed that his chemical dependence, his adolescent antisocial behavior, and his posttreatment sexual assault increase the likelihood that he will reoffend and that these disorders and chemical-abuse problems adversely affect his ability to control his sexual impulses. *See Linehan IV,* 594 N.W.2d at 876–77 (holding that record supported finding that offender lacked adequate control over his sexually harmful behavior when he showed continuing sexual attraction to young females, refused to participate in offered substance abuse treatment, and acted aggressively toward staff while confined).

The results of four different psychological tests confirm their observations. The first two tests, the MnSOST–R and the Static–99, which the expert witnesses viewed as characteristically underestimating the likelihood of reoffense, show, respectively, that Stone had a fifty-nine-percent chance of reoffending within six years and a forty-percent chance of reoffending in five years. On these tests, the two expert witnesses assigned Stone a score that indicates he is highly likely to reoffend. On the third test, the Hare PCL–R, Dr. Marshall assigned Stone a score of twenty-two, which corresponds to a moderate level of psychopathy, and Dr. Meyers assigned Stone a score of thirty-five. On the fourth test, the SVR–20, Dr. Marshall assigned him a score of fourteen, which represents a moderate-to-high risk of reoffending. After observing Stone testify and after reexamining her scoring on direct and cross-examination, Dr. Marshall stated that she had scored Stone conservatively and would likely rate him at a high risk of reoffending. Dr. Meyers and the doctor who conducted the initial psychological examination of Stone both classified him as a high risk under this test.

The expert-witness testimony and the results of the application of the reoffense factors provided clear and convincing evidence that Stone is highly likely to reoffend. The district court's conclusion that Stone is likely to engage in harmful sexual conduct in the future is therefore supported by substantial evidence in the record.

## DECISION

We conclude that clear and convincing evidence established that Stone engaged in a course of harmful sexual conduct and that he is highly likely to engage in sexual misconduct in the future. The state therefore proved the statutory elements for commitment as a sexually dangerous person.

**Reversed.**