*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0237**

In the Matter of the Civil Commitment of:
Jamie Allen Andrews

**Filed August 8, 2016
Affirmed
Peterson, Judge**

Anoka County District Court
File No. 02-PR-15-134

Donald R. Betzold, Fridley, Minnesota (for appellant Jamie Allen Andrews)

Anthony C. Palumbo, Anoka County Attorney, Brianne J. Buccicone, Assistant County
Attorney, Anoka, Minnesota (for respondent Anoka County)

Considered and decided by Bjorkman, Presiding Judge; Peterson, Judge; and
Kalitowski, Judge.[*]

# UNPUBLISHED OPINION

**PETERSON**, Judge

Appellant challenges the sufficiency of the evidence supporting his civil
commitment as a sexually dangerous person (SDP) and the district court's determination
that there is no less-restrictive alternative to commitment to the Minnesota Sex Offender
Program (MSOP). Appellant also challenges the constitutionality of the Minnesota Civil

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

Commitment and Treatment Act (the MCTA), Minn. Stat. §§ 253D.01-.36 (2014). We affirm.

**FACTS**

Appellant Jamie Allen Andrews was indeterminately committed as an SDP in January 2016. In 1995, Andrews, who was then 13 years old, was adjudicated delinquent of two counts of first-degree and one count of second-degree criminal sexual conduct, after he initiated sexual activity in 1994 with three boys that he was babysitting who were ages three, four, and five. Andrews was placed in foster care, and he completed sex-offender treatment at the Mille Lacs Academy.

While in residential foster care in 1999, Andrews met S.N., who became pregnant when she was 15 and Andrews was 17 years old. Andrews and S.N. lived together from 2000-2003, but never married. Their relationship was tumultuous. Andrews has two disorderly-conduct convictions as a result of domestic-assault charges and another disorderly-conduct conviction as a result of a dispute with a neighbor. S.N. alleged other assaultive conduct that was never charged. Andrews also has a juvenile adjudication for assault.

When they separated in 2003, Andrews and S.N. had two children, and Andrews assumed custody of the children on an informal basis. Despite the separation, S.N. and Andrews had a third child, N.J., in 2006. Although N.J. lived with S.N. much of the time, Andrews and his new girlfriend, S.W., cared for N.J. on a regular basis, together with his older children and S.W.'s two children. On May 13, 2007, S.N. dropped thirteen-month-old N.J. off with Andrews. On May 15, 2007, paramedics were called because N.J. was

2

unresponsive. N.J. died two days later of massive head trauma. Andrews was indicted for first-degree murder.

Andrews' two older children were removed from their home, Andrews' and S.N.'s parental rights were terminated, and the children were placed with adoptive parents. The two children made reports to their adoptive parents of sexual contact by Andrews and S.W. that included touching, oral sex, and intercourse. Two counts of first-degree criminal sexual conduct were added to the homicide complaint against Andrews. Andrews denied both the murder allegations and sexual contact with his children, although the children's descriptions of sexual abuse are similar to allegations made against Andrews in 1994 and to Andrews' description of sexual molestation that occurred when he was a child.

In July 2009, Andrews entered an *Alford* plea to charges of second-degree manslaughter and second-degree criminal sexual conduct. He was sentenced to consecutive sentences of 57 months for manslaughter and 90 months for criminal sexual conduct, with an anticipated release date of July 20, 2015. Andrews is subject to a 10-year conditional release term.

Andrews was referred to sex-offender treatment while he was in prison, but he refused to attend after indicating that he did not need sex-offender treatment because he did not commit the offenses against his children. Andrews attended a faith-based treatment program that was not specific to sexual offenders, but he quit the program when he was required to admit to the offenses. Andrews continued to deny culpability for both the sexual abuse and the manslaughter. Andrews had no significant disciplinary actions while in prison.

3

After the civil-commitment petition was filed, Andrews was interviewed and tested by two experts, Dr. James Gilbertson and Dr. Rebecca Seifert. Both experts concluded that Andrews met the criteria for commitment as an SDP: he engaged in a course of harmful sexual conduct; he manifested a sexual, personality, or other mental disorder or dysfunction; and he would be highly likely to engage in harmful sexual conduct. Both experts applied the demographic factors set forth in *In re Linehan (Linehan I)*, 518 N.W.2d 609 (Minn. 1994).

Although both experts agreed that Andrews met the SDP criteria and that he needs sex-offender treatment, they differed as to whether he should be committed to MSOP. Dr. Gilbertson stated that because Andrews denies the offenses, he would not be accepted into or successfully complete a community-based program, but Dr. Seifert thought that Andrews would be amenable to treatment because he successfully completed treatment as an adolescent. She believed that, instead of commitment, Andrews could be placed on intensive supervised release (ISR) with the condition that he participate in a community-based sex-offender treatment program, and she suggested that the commitment petition be continued or stayed until he completed treatment. But she also agreed that "continued denial of his offenses could prevent him from completing treatment, which would be a violation of his conditions of release, which could result in a return to the Department of Corrections."

Andrews submitted a release proposal, which assumed that he would not be civilly committed. He proposed living at 180 Degrees, a halfway house, for the first 60-90 days following his release from prison, but he had no firm plans for long-term housing or

4

employment; he thought he could live with his brother if they could find appropriate housing. A probation officer noted that the only community-based inpatient treatment program available, Alpha Human Services, would not accept clients who had been civilly committed.

The district court concluded that Andrews met the requirements for commitment as an SDP and that Andrews had not sustained his burden of demonstrating that there was a less-restrictive alternative to commitment to MSOP. Andrews appeals from the district court's civil-commitment judgment.

## D E C I S I O N

### I.

Andrews challenges the sufficiency of the evidence to support his commitment as an SDP. We review the district court's commitment decision to determine if the court complied with the statute and the commitment is justified by findings that are based on evidence produced at the hearing. *In re Civil Commitment of Navratil*, 799 N.W.2d 643, 647 (Minn. App. 2011), *review denied* (Minn. Aug. 24, 2011). This court reviews the findings for clear error and in the light most favorable to the findings, and defers to the district court's credibility determinations. *Id.*

Under Minn. Stat. § 253D.02, subd. 16(a), an SDP is defined as a person who "has engaged in a course of harmful sexual conduct"; "has manifested a sexual, personality, or other mental disorder or dysfunction"; and "as a result, is likely to engage in acts of harmful sexual conduct." "'Harmful sexual conduct' means sexual conduct that creates a substantial likelihood of serious physical or emotional harm to another." Minn. Stat.

§ 253D.02, subd. 8(a). There is a rebuttable presumption that victims of first-degree or second-degree criminal sexual conduct suffer serious physical or emotional harm. *Id.*, subd. 8(b). To decide whether the proposed patient engaged in a course of harmful sexual conduct, a court may consider both conduct for which a person was convicted and conduct that did not result in a conviction. *In re Civil Commitment of Stone*, 711 N.W.2d 831, 837 (Minn. App. 2006), *review denied* (Minn. June 20, 2006). The conduct, which need not be recent, must occur over a period of time, "[a]nd the existence of a period in which the person has not committed sex offenses does not preclude a determination that he engaged in a course of sexual misconduct." *Id.* at 837-38.

The district court found that Andrews engaged in a course of harmful sexual conduct based on the three criminal-sexual-conduct adjudications in 1995 and the criminal sexual conduct against his children in 2006-07, which resulted in an *Alford* plea to second-degree criminal sexual conduct. The district court found that Andrews manifested a sexual, personality, or other mental disorder or dysfunction. Both experts testified that Andrews has "Other Specified Paraphilic Disorder" and "Antisocial Personality Disorder." The district court noted that Andrews' adult sexual offenses "mirrored his juvenile offenses as did his non-sexual offenses," which supports the experts' findings of a mental disorder or dysfunction. The district court found that this disorder or dysfunction "has a direct connection to his inability and failure to adequately control his sexual impulses and behavior."

Finally, the district court found that the experts' opinions showed that Andrews was highly likely to engage in harmful sexual conduct. The district court relied on the various

6

actuarial and diagnostic studies the experts performed and on their application of the *Linehan* factors, which indicated:

(1) Andrews' age, 34 at the time of commitment, increases the risk of future harmful conduct, although the risk will decrease over time as he ages, and his long-term relationship decreases the risk somewhat;

(2) Andrews has a history of violent behavior, based on domestic-abuse reports and the injuries that led to N.J.'s death;

(3) The actuarial statistics for violent behavior among individuals with Andrews' background support a finding that Andrews is highly likely to reoffend;

(4) Andrews would be subject to significant stress in the community, including finding housing and employment, managing relationships, controlling his mood disorder, and establishing a network of social support;

(5) Andrews has not shown any ability to live peaceably in a relationship, manage anger and frustration, or maintain employment and housing;

(6) Andrews is essentially an untreated sex offender; although he completed sex-offender treatment in early adolescence, he has no relapse-prevention strategy or insight into why he targets children, and his complete denial of culpability makes it unlikely that he would benefit from treatment.

*See Linehan I*, 518 N.W.2d at 614.

The district court also found that (1) Andrews' juvenile and adult crimes were similar, and he used his position of authority to accomplish sexual contact without violence; (2) Andrews completely denied wrongdoing and failed to take any responsibility

7

for his conduct; (3) Andrews reoffended even after receiving sex-offender treatment as an adolescent, and he withdrew from another program rather than admit wrongdoing; and (4) Andrews has no relapse-prevention program, is impulsive and easily frustrated, and blames others for his problems.

Andrews argues that the court incorrectly found the dates of sexual abuse with his children as August 2, 2006, through May 2007. Andrews asserts that he lived with his mother until October 1, 2006, and no abuse could have occurred during that time. His children did not give specific dates for the abuse but said that it happened frequently and during that approximate period. An incorrect date does not undermine the district court's decision. Andrews also contends that his family members never saw any evidence of abusive conduct. But the district court found that the children's descriptions of the sexual abuse were credible and that Andrews and the witnesses he presented, including his mother, mother's significant other, and a family friend, were not credible. In particular, the court stated that in light of Andrews' history of domestic violence and the reports of S.W., S.N., and his children about his violent disciplinary tactics, his witnesses were not credible when they testified that he never disciplined the children.

Andrew also argues that there was no indication of sexual misconduct between his release from Mille Lacs Academy and the children's allegations. But a harmful course of conduct can be based on events that are not recent. *See Stone*, 711 N.W.2d at 837. Finally, Andrews contends that his victims are no longer at risk because they are now adults or teenagers. But this contention begs the question whether he would engage in similar behavior with other children.

8

The district court's conclusion that Andrews meets the criteria for commitment as an SDP is based on clear and convincing evidence and complies with the statute and interpretive law.

**II.**

Andrews argues that the district court "was required to determine that a less restrictive treatment program is available, is willing to accept [him] under commitment, and is consistent with [his] treatment needs and the requirements of public safety." Andrews has conflated two issues. At the commitment hearing, Andrews argued that, instead of being civilly committed, he could be released on ISR after his prison term, he would be closely supervised and subject to reimprisonment if he failed to adhere to the conditions of release for ten years, and, because of this, he would not be highly likely to reoffend. He was supported by Dr. Seifert, who recommended that the commitment petition be stayed or continued to permit Andrews to be released under supervision. Andrews styles this alternative as a "less restrictive treatment program" under Minn. Stat. § 253D.07, subd. 3. But that subdivision refers to the treatment facility chosen by the court when a person is committed; it does not refer to alternatives to commitment.

The district court rejected ISR as an alternative to commitment by deciding that Andrews met the standards for civil commitment as an SDP. The district court concluded that Andrews' plans were too vague, his family support was insufficient because his family members would not hold him accountable, and he failed to demonstrate acceptance into an inpatient or outpatient program, or even to show that it was likely he would be accepted. The district court's decision is based on clear and convincing evidence.

Minn. Stat. § 253D.07, subd. 3, states that if a court

> finds by clear and convincing evidence that the respondent is a sexually dangerous person . . ., the court *shall* commit the person to a secure treatment facility unless the person establishes by clear and convincing evidence that a less restrictive treatment program is available, is willing to accept the respondent under commitment, and is consistent with the person's treatment needs and the requirements of public safety.

(Emphasis added.) The patient has the burden of establishing by clear and convincing evidence that a less-restrictive program is available. *In re Robb*, 622 N.W.2d 564, 574 (Minn. App. 2001), *review denied* (Minn. Apr. 17, 2001). In concluding that no less-restrictive alternative to commitment to a secure facility is available, the district court must make findings that permit meaningful appellate review. *In re Civil Commitment of Ince*, 847 N.W.2d 13, 25-26 (Minn. 2014).

The district court cited the testimony of the two experts and the probation officer, noting that they agreed that Andrews needs to participate in sex-offender treatment. Dr. Gilbertson and the probation officer testified that no community-based treatment program had accepted Andrews and the most likely program, Alpha Human Services, would not accept a civilly committed person. The court also concluded that Andrews' continued denial of wrongdoing made it unlikely that he would successfully complete treatment. Based on these observations, the district court concluded that Andrews had not sustained his burden of demonstrating that there is a less-restrictive alternative to commitment to MSOP. We agree.

10

## III.

Andrews argues that the MCTA is unconstitutional facially and as applied, relying on the federal district court's opinions in *Karsjens v. Piper (Karsjens I)*, 109 F. Supp. 3d 1139 (D. Minn. 2015) (holding that part of MTCA is unconstitutional); *Karsjens v. Piper (Karsjens II)*, No. 11-3659 (D. Minn. Oct. 29, 2015) (directing state to undertake remedial action); and *Karsjens v. Piper (Karsjens III)*, No. 11-3659 (D. Minn. Nov. 23, 2015) (denying state's motion for a stay). On December 15, 2015, the Eighth Circuit Court of Appeals stayed the federal district court's October 29, 2015 order pending appeal. *Karsjens v. Piper* (*Karsjens IV),* No. 15-3485 (8th Cir. Dec. 15, 2015). An appellate court has the "inherent" authority to "hold an order in abeyance while it assesses the legality of the order." *Nken v. Holder*, 556 U.S. 418, 426, 129 S. Ct. 1749, 1756 (2009) (quotation omitted). A stay of judicial proceedings "simply suspends judicial alteration of the status quo." *Id.* at 429, 129 S. Ct. at 1758 (quotation omitted). Therefore, the Eighth Circuit's stay of the *Karsjens II* order suspends the effectiveness of that order. Andrews cannot rely on a stayed interlocutory order as a basis for relief.

Even without the Eighth Circuit's action, *Karsjens I* does not hold that initial commitment under the MCTA is unconstitutional; the federal district court commented, "The public should know that [MSOP] facilities will not be immediately closed. This case has never been about the immediate release of any single committed individual or committed individuals." *Karsjens I*, 109 F. Supp. 3d at 1144.

The MCTA initial commitment procedures have been found to comply with substantive due process. *In re Linehan (Linehan IV)*, 594 N.W.2d 867, 875-76 (Minn.

11

1999); *In re Civil Commitment of Ramey*, 648 N.W.2d 260, 267 (Minn. App. 2002), *review denied* (Minn. Sept. 17, 2002). Andrews is not entitled to relief based on the *Karsjens* opinions.

**Affirmed.**